DANNY KAYE AND SYLVIA KAYE, ·PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CY HOWARD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 64451, 64452. Filed December 16, 1959.

*Bernard Speisman, Esq.*, and *George V. Delson, Esq.*, for the petitioners.

*Emil Sebetic, Esq.*, for the respondent.

OPINION.

HARRON, *Judge:* The respondent determined deficiencies in income tax for the taxable year 1952 as follows:

| Docket No. | Petitioners | Deficiencies |
|---|---|---|
| 64451 | Danny Kaye and Sylvia Kaye | $19,667.66 |
| 64452 | Cy Howard | 33,452.93 |

Each deficiency results from the respondent's disallowance of a deduction for payment of alleged interest in 1952. The amount deducted as interest by Sylvia Kaye is $23,750. The amount deducted as interest by Cy Howard is $38,750. Each petitioner individually entered into a series of separate transactions with the same broker which purported to be for the purchase, on margin, of certificates of deposit issued by various banks. Each transaction was carried out with borrowed funds and culminated in purported resales of the certificates of deposit. The chief question is whether payments made by each petitioner in 1952 represented interest within the purview of section 23(b) of the 1939 Code.

All of the chief facts have been stipulated. The facts are found as stipulated; the stipulation of facts is incorporated herein by this reference.

Sylvia and Danny Kaye reside in Beverly Hills, California. They filed a joint income tax return for the calendar year 1952 on a cash basis with the collector of internal revenue for the sixth district of California in Los Angeles.

Cy Howard, a resident of California, filed his individual income tax return for the calendar year 1952, on a cash basis, with the collector of internal revenue for the sixth district of California in Los Angeles.

Danny Kaye is a well-known entertainer of the stage, screen, radio,

and television. Sylvia Kaye, his wife, is an advisor of and business agent for Danny Kaye. Since the issue in the Kaye's case relates to Sylvia, only, she is referred to hereinafter as the petitioner.

Cy Howard is a well-known writer and producer in the entertainment business.

Both the Kayes and Cy Howard used the following business address in their respective income tax returns: "c/o Lefkowitz and Berke, 9130 Sunset Blvd., Los Angeles 46, California." The foregoing is an abbreviation of the name of an accounting firm, Lefkowitz, Berke, Parker & Freedman, hereinafter referred to as the Lefkowitz accountants. That firm has another office at 465 South Beverly Drive, Beverly Hills, California. It furnished the Kayes and Howard accounting and auditing services and prepared for them financial statements and their respective income tax returns. The returns for 1952 of all of the petitioners were prepared by that firm.

Cantor, Fitzgerald & Co., Inc., hereinafter called CanFitz, is an investment brokerage firm, an underwriter and distributor of investment securities, and a broker-dealer in listed securities and in over-the-counter securities. It is registered with both the Securities and Exchange Commission and the National Association of Security Dealers (of which it is a member) as a broker-dealer and it is subject to audits by and the regulations of both agencies. It has offices in Beverly Hills, San Francisco, and New York.

Sylvia Kaye and Cy Howard each, in their individual capacities, entered into transactions in 1952 with CanFitz which involved time certificates of deposit obtained by CanFitz in 1952. According to Regulation D, as amended, of the Board of Governors of the Federal Reserve System, effective September 16, 1948, a time certificate of deposit is evidence of a time deposit in a bank (other than a demand deposit) which is to be held by the bank for a specified length of time of not less than 30 days after the date of deposit. A time certificate of deposit and the time deposit it evidences have a maturity date. It may be a nonnegotiable or a negotiable instrument which provides on its face that the amount of such deposit is payable to bearer, or to any specified person or to his order. It is payable in all cases only upon presentation and surrender. Regulation D defines time certificates of deposit as follows:

(c) Time certificates of deposit.—The term "time certificate of deposit" means a deposit evidenced by a negotiable or non-negotiable instrument which provides on its face that the amount of such deposit is payable to bearer or to any specified person or to his order—

(1) On a certain date, specified in the instrument, not less than thirty days after the date of deposit, or

(2) At the expiration of a certain specified time not less than thirty days after the date of the instrument, or

(3) Upon notice in writing which is actually required to be given not less than thirty days before the date of repayment, and

(4) In all cases only upon presentation and surrender of the instrument.

In the case of Sylvia Kaye, transactions with CanFitz were entered into by her which involved 2 certificates of deposit. In the case of Cy Howard, transactions were entered into by him with CanFitz which involved 8 certificates of deposit. All of the certificates of deposit were unregistered negotiable instruments, which did not bear interest, which were issued in 1952 by various banks in California and Texas. All of the transactions of both petitioners with CanFitz were entered into in 1952.

The parties have agreed upon an explanation of a commercial practice through which a business concern may borrow capital to be kept on deposit for a stated period at its bank in order to maintain a "compensating minimum deposit balance" to sustain its revolving fund line of credit with its bank. Finance companies avail themselves of this method of borrowing capital. The arrangements which give rise to a bank's issuance of a certificate of deposit may be illustrated by the following example:[1]

Beverly Finance Company has a line of credit with the Anglo-California National Bank. The bank requires Beverly Finance Company to maintain a compensating minimum balance in its account of $150,000. Resolute Insurance Company will make a deposit of $150,000 in the Anglo-California Bank for Beverly, for a fee or a charge to Beverly of 2½ per cent interest per annum, upon the request of Beverly.[2] Beverly requests Resolute to make such deposit to its account. Resolute transfers $150,000 to Anglo-California Bank which issues to Resolute a certificate of deposit in the amount of $150,000, payable at

---

[1] The above example, although not stated in precisely the words used in the stipulation of the facts of the parties, is based upon paragraphs 8 and 9 of the stipulation, Exhibits 3–C and 4–D, and an oral explanation of respondent's counsel given during the trial.

[2] The parties introduced in evidence a letter of Resolute Insurance Company of Hartford, Connecticut, Exhibit 4–D, which states, in part, as follows:

"We are now making available funds which we will deposit with your banks, to be used as an off-set to the compensating balance requirements.

\* \* \* \* \* \* \*

Resolute Insurance Company will make deposits with such designated banks at the request of finance and loan companies in amounts ranging from $10,000 to $1,000,000 at an interest charge of 2½ % per annum. To make such funds available to you, simply contact your bank or banks, and advise them that we will deposit amounts equal to your compensating balance requirements.

Upon receipt of notice from you that you wish such an arrangement, we will forward a check to the designated bank in the required amount in purchase of a Certificate of Deposit. Please indicate the name of the bank, address and the name of the officer to whose attention our deposit should be directed.

In communicating with the bank, we will advise them that the deposit is made as an off-set to your balance requirements—with a copy of such letter going to your office; at the same time, we will ask the bank to confirm to you receipt of such deposit.

Banks from coast to coast have endorsed the plan for its simplicity and lack of red tape. Finance factors hail it as an effective means of increasing the size of their borrowings and of converting frozen funds into liquid working capital."

the expiration 1 year after notice of intended withdrawal shall have been given to the bank and upon the surrender of the certificate properly endorsed. Anglo-California Bank does not pay interest on the amount of $150,000.

Resolute may retain the certificate of deposit for the period of the deposit, or it may sell the certificate, or otherwise deal with it in the same way as may be done with any other negotiable security.

The amount of the fee charged by Resolute, or some other firm which engages in a transaction for the acquisition of a certificate of deposit, generally varies according to the prevailing interest rate charged on the money market.

Cantor, Fitzgerald & Co., Inc., in 1951, entered into a business practice (in addition to its other business activities) of making funds available to clients for deposit in a bank evidenced by the bank's time certificate of deposit, and it also dealt in time certificates of deposit. For convenience, a certificate of deposit is sometimes referred to hereinafter as a CD.

During 1952, CanFitz suggested to the Lefkowitz accounting firm that high-bracket taxpayers might realize tax savings by acquiring non-interest-bearing certificates of deposit by the use of borrowed funds. CanFitz suggested a pattern of procedure, as follows: A taxpayer would purchase from CanFitz, acting as a dealer, a certificate of deposit of the type described above. The purchase price to the taxpayer would be an amount equal to about 5.25 per cent less than the face amount of the CD, or a discount of such per cent. However, the taxpayer would not be obliged to make any cash payment in any amount for the CD or give his note. The purchase would be made under a margin account with CanFitz; CanFitz would make a "loan" to the purchaser; and the purchaser would pay in advance interest on the loan at the rate of 10 per cent. The amount of the loan would be the face amount of the CD. Since the amount of the loan would exceed the purchase price at a discount, CanFitz would pay to the "borrower," in cash, the difference between the two amounts. The CD would not be delivered to the purchaser but would be held by Can-Fitz or whoever might receive it as a pledgee of CanFitz. CanFitz could pledge the CD. After 6 months and before the maturity of the CD, the CD would be sold for the taxpayer's account. He could report the gain realized (if any) as long-term capital gain, and he would claim a deduction, as interest expense, for the amount of the "interest" paid on the loan.

The above plan can be illustrated as follows: CanFitz has a client (a finance company) which wants a time deposit made for it at its bank, Anglo-California, in the amount of $150,000 on October 21, 1952, for 210 days until May 19, 1953. CanFitz, as a broker, arranges

with Cleveland Trust Company to make the time deposit out of the funds of Cleveland Trust and obtain a CD from the bank in the amount of $150,000. CanFitz advises a taxpayer-client, who is willing to enter into a transaction to purchase a CD from it on margin, that a CD can be "purchased." Under the plan, CanFitz "loans" the taxpayer-client $150,000 for 210 days, from October 21, 1952, to May 19, 1953, and charges 10 per cent as interest on the loan. Actually, $150,000 is not paid over by CanFitz; the loan is represented by bookkeeping entries. As of October 21, 1952, the purchase price of the CD is $145,406.25, or 96.9375 per cent of the face amount. Since the "loan" to the taxpayer is $150,000, CanFitz pays the difference, $4,593.75, in cash to the taxpayer-client. The amount of the interest on the loan is $8,750 and that amount is prepaid as of October 21, 1952. The taxpayer-client can use the cash he has received from CanFitz, as part of the "loan," in making the interest payment, so that he needs to use only $4,156.25 of his own cash in making prepayment of the interest. After 6 months, when the CD is sold, most of the loan will be offset by entering on the books the amount of the sale. The difference will then be paid by the taxpayer-client to CanFitz.

The Lefkowitz accountants contacted Sylvia Kaye and Cy Howard and gave to each the same explanation of the plan as they had received from CanFitz, and recommended that entering into such transactions might be considered.

The petitioners realized that, apart from the expected tax effects, such transactions would probably result in a financial loss, but the forecasted tax-savings features prompted each to favorably consider transactions involving certificates of deposit.

Sylvia Kaye and Cy Howard, individually and separately, agreed to enter into such transactions. Each authorized CanFitz to enter into, and arrange for, the transactions hereinafter set forth which gave rise to the issue presented. In so doing, each considered that he was purchasing certificates of deposit on money borrowed from CanFitz.

On or about July 24, 1952, Cy Howard executed a customer's agreement which was transmitted to him by CanFitz. On or about October 28, 1952, Sylvia Kaye executed the same form of a customer's agreement. The agreement was as follows:

CANTOR, FITZGERALD & CO., INC.
DEAR SIRS:

In respect of all accounts which I now have, or may hereafter have with you, for the purchase or sale of securities or commodities, I hereby agree:

First: This agreement and all transactions, whether you are acting as broker or principal, shall be governed by the laws of the State of New York and subject to the constitution, rules, customs and usages of the exchange or market, including the over-the-counter market, and its clearing house, if any, where the transactions are effected.

Second: That all securities and commodities now or hereafter carried in my account or deposited to protect the same or held by you for me may be loaned or pledged by you, either separately or together with securities and commodities belonging to others, irrespective of any amount being due thereon, or for more than the amount due thereof, without further notice; and you shall not be required to deliver to me the identical securities or commodities carried in my account or deposited or held by you for me, but only securities or commodities of the same kind and amount.

Third: That all such securities and commodities shall secure all my liabilities to you; and you are authorized in your discretion to sell all or any of them or buy any securities or commodities to cover any of my commitments, at public or private sale, on twenty-four hours notice to the address below, when in your opinion my margin is insufficient; and so to sell or buy such securities and commodities without margin demand or notice to me if at any time my margin at the current market prices shall not exceed fifteen percent of my liabilities to you, and this authorization shall not be affected by any practice or specific demand or notice.

Fourth: That all notices and demands may be made by mailing, telegraphing or telephoning the same to my address, or by oral communication to me. If such notice or demand be made by letter or telegram, the time is to be reckoned from the hour the letter is mailed or the telegram delivered to the telegraph company. The risk of delay or non-delivery is assumed by me and the address given below is to be treated as my address unless I shall advise you of a change in my address by registered mail or telegram. All statements of account or reports mailed to my address shall be taken to be correct unless you immediately receive notice to the contrary.

Fifth: That any controversy with respect to any liability by reason of anything done or left undone by either of us in connection with, or in the purchase or sale of, securities and/or commodity contracts or any claim that either of us has acted wrongfully or without authority, or that either of us is indebted to the other, shall be settled by and pursuant to what is known as the "Arbitration Law" being Chapter 72 of the Consolidated Laws of New York, and in no other manner.

I am of full age and have unlimited capacity to contract. I am not a clerk or employee of any stock or commodity exchange or of a member thereof, or of any bank, trust company, banker, or insurance company, or of any broker, firm or corporation engaged in the business of dealing in securities or commodities.

I understand that no one of your agents or employees is authorized or empowered to change this agreement nor to make promises or assurances inconsistent herewith. This agreement shall be binding upon me and my estate and shall enure to the benefit of you, your successors and assigns; should my account be closed at any time and later be reopened, this agreement shall continue in effect as to the account so reopened; and this agreement shall be modified only in writing, expressly purporting so to modify it, signed by a member of your firm and by me, and shall continue until revoked by me in writing, such revocation to affect only transactions thereafter entered into.

Yours very truly,

Signature  _____

Address  _____

All of the 10 certificates of deposit involved in the separate transactions of Sylvia Kaye and Cy Howard, respectively, were bona fide

certificates which were obtained by CanFitz in arm's-length transactions for its clients, finance companies, in a customary way in the ordinary course of business. Each CD was created out of the necessity of the particular finance company involved to maintain a compensating minimum deposit balance in a bank with which it carried a line of credit. Each CD was obtained for its client by CanFitz in a transaction which was independent of the subsequent transactions between CanFitz and Sylvia Kaye and Cy Howard, respectively. In each instance a time deposit was made for the finance company to its credit in its particular bank. The finance company for which the time deposit was made was Beverly Finance Company of Los Angeles in one instance, and Bankers Discount Corporation in nine instances. In the instance of Beverly Finance Company, a time deposit for 210 days of $150,000 was made on October 21, 1952, to its credit in the Anglo-California National Bank in San Francisco, and the Anglo-California National Bank issued a CD, which did not bear interest, on October 21, 1952, the effective date, which matured on May 19, 1953, the maturity date. For Bankers Discount Corporation, separate time deposits were made to its credit in 8 different banks in different cities in Texas and in a branch office in San Francisco of the Bank of America, and each bank issued its non-interest-bearing CD. The CD issued by the Bank of America was dated December 12, 1952, and it matured 360 days thereafter on December 7, 1953. The other 8 CD's, which were issued by different banks in Texas, were issued on July 25, 1952, and each matured 360 days thereafter on July 20, 1953. The total face amount of the 10 CD's was $687,500, and they were evidence of 10 time deposits totaling the same amount.

Each of the 10 CD's was arranged for, or obtained, by CanFitz for a particular finance company, referred to above, in the following way: About a week before each CD was issued by a bank, a finance company requested CanFitz to purchase from a designated bank, in lieu of the finance company's compensating balance with the bank, a negotiable time certificate of deposit in a specified amount for a specified time, to be effective and to mature on specified dates. CanFitz agreed to obtain the CD. In each instance CanFitz contacted the Cleveland Trust Company in Cleveland, Ohio, with which CanFitz had a line of credit, and borrowed from Cleveland Trust Company the required amount, for which CanFitz gave its own promissory note to Cleveland Trust. By its own check, CanFitz paid Cleveland Trust the amount of interest ($2\frac{1}{8}$ per cent or 2 per cent) for the period of the loan as required by Cleveland Trust. Cleveland Trust then telegraphed funds, in the same amount as the loan, to the finance company's bank to be deposited to its account as a time deposit. CanFitz

transmitted its note and its check for interest to Cleveland Trust; it notified the finance company's bank that the amount of the time deposit was being transmitted to it by Cleveland Trust; and it requested that a CD, being purchased to satisfy the compensating balance requirement, be issued and sent to Cleveland Trust. Upon receipt of the funds for the time deposit, the finance company's bank issued its CD in the amount of the deposit and in the name and terms requested, and transmitted the CD by registered mail to Cleveland Trust Company, as instructed. In every instance, in the case of the 10 CD's in question, it was stated on the face of the CD that the depositor of the time deposit was Cantor, Fitzgerald & Co., Inc., and that the CD was payable to the order of R. M. Bourne & Co., a nominee, located in Cleveland, of the Cleveland Trust Company. The finance company on whose behalf the CD was purchased, after being notified by its bank of the making of the time deposit, sent CanFitz a check for the amount of the interest charged by Cleveland Trust (and paid by CanFitz), plus the service charge of CanFitz for its services, which was about seven-eighths of 1 per cent. That is to say, whereas CanFitz paid interest to Cleveland Trust at the rate of 2 per cent of the loan for the period of the CD, the finance company paid CanFitz $2\frac{3}{4}$ per cent; or if CanFitz paid interest to Cleveland Trust at the rate of $2\frac{1}{8}$ per cent, the finance company paid CanFitz either 3 per cent or $2\frac{3}{4}$ per cent. In respect of the 10 CD's, CanFitz paid Cleveland Trust $12,796.87, as interest, and it received from the finance companies a total of $17,406.25.

Thereafter, when Cleveland Trust received each CD, it notified CanFitz that it had put the loan to and the note of CanFitz in force effective as of the same date as the time deposit involved, and that it was holding the CD as collateral for the loan to and the note of CanFitz. That is to say, all of the 10 CD's in question were at all times material held by the Cleveland Trust Company; they were not held by or in the possession of CanFitz.

The following example, which is typical of each one of the CD's in question, illustrates the procedure of CanFitz and of Cleveland Trust Company, as described in general above: About 1 week before July 25, 1952, Bankers Discount Corporation requested CanFitz to purchase from the Texas Bank & Trust Company in Dallas, Texas, a CD in the amount of $150,000, effective July 25, 1952, and to mature 360 days thereafter on July 20, 1953, to evidence a time deposit to the credit of Bankers Discount Corporation in lieu of its compensating balance with Texas Bank & Trust. CanFitz contacted Cleveland Trust to transmit by wire $150,000 to Texas Bank & Trust, and CanFitz negotiated a loan to itself for that amount, sending its note to

Cleveland Trust for $150,000 and its own check for the interest on the loan, $3,000, at the rate of 2 per cent interest for 360 days. Cleveland Trust wired the funds to the bank in Dallas. The Texas Bank & Trust Company issued its CD, dated July 25, 1952, and maturing July 20, 1953, and mailed it to Cleveland Trust. The CD was payable to the order of R. M. Bourne & Co.; the nominee of Cleveland Trust. It recited that the depositor was CanFitz. Bankers Discount Corporation sent its check to CanFitz in the amount of $4,125, which amount reimbursed CanFitz for interest charged by Cleveland Trust in the amount of $3,000, plus the service fee of CanFitz in the amount of $1,125. Cleveland Trust at all times material held the CD as collateral for the loan to CanFitz, along with the note of CanFitz which ran from July 25, 1952, to July 20, 1953.

The following schedule lists the 10 CD's involved in these cases. The number shown in the first column is a number given here for convenience in lieu of the actual CD number, 6 having been issued by a bank without any designating number. The last column gives the name of the taxpayer, one of the petitioners, whose transaction with CanFitz, hereinafter described, involved the particular CD.

| No. of CD | Face amount of CD | Effective date | Maturity date | Issuing bank | Petitioner's transaction |
|---|---|---|---|---|---|
| 1 | $150,000 | 10/21/52 | 5/19/53 | Anglo-California Nat'l. Bk. of San Fran., Calif___ | Sylvia |
| 2 | 150,000 | 12/12/52 | 12/ 7/53 | Bank of America, San Fran., Calif., Branch Office. | Sylvia |
| 3 | 150,000 | 7/25/52 | 7/20/53 | Texas Bank & Trust Co., of Dallas, Tex_____ | Howard |
| 4 | 50,000 | 7/25/52 | 7/20/53 | First National Bank, of Waco, Tex_____ | Howard |
| 5 | 50,000 | 7/25/52 | 7/20/53 | Corpus Christi Bk. & Trust Co., of C.C., Tex____ | Howard |
| 6 | 37,500 | 7/25/52 | 7/20/53 | Citizens Nat'l. Bk., of Greenville, Tex_____ | Howard |
| 7 | 25,000 | 7/25/52 | 7/20/53 | El Paso Nat'l. Bk., of El Paso, Tex_____ | Howard |
| 8 | 25,000 | 7/25/52 | 7/20/53 | American Nat'l. Bk., of Amarillo, Tex_____ | Howard |
| 9 | 25,000 | 7/25/52 | 7/20/53 | Bexar County Nat'l. Bk., of San Antonio, Tex____ | Howard |
| 10 | 25,000 | 7/25/52 | 7/20/53 | South Main State Bk., of Houston, Tex_____ | Howard |
| | 687,500 | | | | |

*Transactions of Sylvia Kaye.*

The petitioner Sylvia Kaye, in 1952, entered into two transactions for the alleged purchase of two certificates of deposit in the face amount of $150,000, each. One CD, No. 102861 (No. 1 in the above schedule), had been issued by the Anglo-California National Bank of San Francisco; it was dated (effective date) October 21, 1952; the date of maturity was May 19, 1953, 210 days. The other CD, No. 1980 (No. 2 in the above schedule), had been issued by a branch office in San Francisco of the Bank of America; its issuance, or effective, date was December 12, 1952, and its date of maturity was December 7, 1953, 360 days. During 1952, petitioner made two payments to CanFitz, by

separate checks, representing prepaid interest on margin account loans to her by CanFitz. The amount of each payment was computed at the rate of 10 per cent of the loan or face amount of each CD, and was as follows:

| CD | Face amount | Payments representing prepaid interest |
|---|---|---|
| 102861 | $150,000 | $8,750 |
| 1980 | 150,000 | 15,000 |
| | | 23,750 |

In their joint return for 1952, the petitioners deducted $23,750 as interest paid. The respondent disallowed the deduction. He gave the following explanation for his determination:

It is concluded that the item claimed for interest paid in the amount of $23,750.00 does not represent a proper deduction under the provisions of the Internal Revenue Code of 1939.

Each transaction of Sylvia Kaye was carried out in the same way, the only differences being in the details relating to each CD. In each instance CanFitz transmitted to Sylvia a standard form of confirmation of sale of a CD. Each sale was purportedly made on or about the issuance, or effective, date of each CD. The confirmation of sale relating to CD No. 102861, issued by Anglo-California National Bank on October 21, 1952, recites as follows: CanFitz, as dealer, confirmed a sale to Sylvia of a time certificate of deposit in the amount of $150,000, maturing May 19, 1953, at a price of 96.9375 per cent for a selling price of $145,406.25 (or a discount of $4,593.75 below the face value). The transaction and settlement dates were stated to be October 21, 1952. The confirmation of sale was sent to Sylvia in care of the Lefkowitz accounting firm. The confirmation of sale of CD 1980 was in identical form except for the details. The selling price of the second CD, issued by the Bank of America on December 12, 1952, was at 94¾, $142,125, or at a discount of $7,875 below the face value of $150,000. The transaction and settlement dates were October 5, 1952, before the effective date of the CD, and December 12, 1952, the effective date of the CD, respectively.

In connection with the purchase of each CD, Sylvia did not pay CanFitz any amount at any time upon the purchase price, and she did not give any note for any loan.

On or about the effective date of each CD, CanFitz recorded on its books that it had made a loan to Sylvia in the *face amount* of each CD, $150,000, each, and that interest was charged at the rate of 10 per cent per annum. CanFitz notified Sylvia by letters to that effect and that each CD would be carried by it (on its books) as collateral

for such loans. (The CD's had been hypothecated by CanFitz with Cleveland Trust Company to secure the loans to CanFitz with which the CD's had been acquired.) In the same letters, CanFitz advised her also of the total amount of the interest charge on each loan and requested prepayment thereof before completion of the transactions of sales to her.

Sylvia's purchases of CD's were handled in the following way:

CD, No. 102821, Anglo-California Bank, $150,000: CanFitz, per books, loaned Sylvia $150,000. The purchase price to Sylvia of the CD was $145,406.25, and CanFitz gave her its check for $4,593.75, the balance of the loan. The charge of CanFitz for interest on the loan of $150,000, at 10 per cent, was $8,750. Sylvia sent her check to CanFitz for that amount to prepay the interest. However, since she received $4,593.75 from CanFitz as a "loan," she used out of her cash only the net amount of $4,156.25 to pay the charge. On its books, CanFitz entered $8,750 as "interest income" received by it. This transaction was closed on October 28, 1952. The respective checks of Sylvia to CanFitz, and of CanFitz to Sylvia, bore that date.

CD, No. 1980, Anglo-California Bank, $150,000: CanFitz, per books, loaned Sylvia $150,000. The purchase price to her of the CD was $142,125, and CanFitz gave her its check for $7,875, the balance of the loan. The charge of CanFitz for interest for 360 days on the loan of $150,000, at 10 per cent, was $15,000. Sylvia sent her check for that amount to CanFitz to prepay the interest. However, since she received $7,875 from CanFitz as a "loan," she used out of her cash only the net amount of $7,125 to pay the charge. On its books, CanFitz entered $15,000 as "interest income." This transaction was closed on December 11, 1952. The respective checks of Sylvia to CanFitz, and of CanFitz to Sylvia, bore that date.

The net amount paid by Sylvia out of her own funds to cover the "interest" charges of CanFitz totaled $11,281.25.

In the customer's agreement executed by Sylvia, in the second paragraph, she agreed that CanFitz could pledge securities carried in her account. Consistent with that clause, CanFitz treated the CD's held by Cleveland Trust as collateral to secure the notes of CanFitz as securities of a customer which it had pledged. Accordingly, CanFitz gave formal notice to the Cleveland Trust Company (pursuant to rule X–8c–1, or X–15c2–1)[3] that CD's Nos. 102821 and 1980 were carried for the account of a customer and that it had legal authority to hypothecate the CD's.

---

[3] The rules referred to by the parties in their stipulation are par. 240.8c–1, and par. 240.15c2–1 of regulations of SEC. See 17 C.F.R. (1949 ed.), Commodity and Securities Exchanges.

The following schedule summarizes the two transactions of loans to Sylvia to cover her purchases of two CD's:

LOANS OF CANFITZ TO SYLVIA KAYE

| Dates | Total loan [1] | Purchase price of CD's | Cash loan | Prepaid "interest" |
|---|---|---|---|---|
| Oct. 28, 1952_____ | $150,000 | $145,406.25 | $4,593.75 | $8,750 |
| Dec. 11, 1952_____ | 150,000 | 142,125.00 | 7,875.00 | 15,000 |
| | 300,000 | 287,531.25 | 12,468.75 | 23,750 |

[1] Face amount of each CD.

In 1953, pursuant to the order of Sylvia, shortly before the maturity date of each CD but after 6 months from the issuance date of each and of Sylvia's "purchase," CanFitz sold each CD for her account at a profit, and in each instance sent her a standard form of confirmation of sale in care of the Lefkowitz accounting firm.

The confirmation of the sale of the CD issued by Anglo-California National Bank on October 21, 1952, recited that CanFitz, as broker, had sold for her account the time certificate of deposit of the above bank maturing May 19, 1953, for $149,671.87, and that the broker's commission was $75. The net amount of this sale was $149,596.87. The date of the sale was April 27, 1953, and the settlement date was May 4, 1953. The confirmation of the sale of the second CD was identical except for details. The CD issued by the Bank of America, which matured on December 7, 1953, was sold on November 27, 1953, and the settlement date was December 3, 1953. This CD was sold for Sylvia's account for $149,912.49. No broker's commission was charged. It was sold by CanFitz as a dealer, not as a broker.

CanFitz entered on its books, in Sylvia's account, credits for the net amount of the selling price of each CD against the two loans to her of $150,000, each. The balance owing by Sylvia to CanFitz with respect to each loan, per books, was $403.13 and $87.51, as the following shows:

ANGLO-CALIFORNIA CD

| | | |
|---|---|---|
| Oct. 21, 1952 | Loan to S.K., per books_____ | $150,000.00 |
| Apr. 27, 1953 | Sale of CD for S.K._____ | 149,596.87 |
| | Bal. due CanFitz_____ | 403.13 |

BANK OF AMERICA CD

| | | |
|---|---|---|
| Dec. 11, 1952 | Loan to S.K., per books_____ | $150,000.00 |
| Nov. 27, 1953 | Sale of CD for S.K._____ | 149,912.49 |
| | Bal. due CanFitz_____ | 87.51 |

CanFitz notified Sylvia, in each instance, of the sale of a CD, and of the balance of the outstanding loan. She sent CanFitz, shortly

after the date of each sale in 1953, her checks in the amounts of $403.13 and $87.51.

Since each CD was sold a few weeks or a few days prior to its maturity date in 1953, there was unused a small amount of the interest which had been prepaid. CanFitz refunded to Sylvia the amounts of the unused interest prepayments. They amounted to $625.05 and $166.65, or a total of $791.70, as the following shows:

LOAN FOR ANGLO-CALIFORNIA CD

| | | |
|---|---|---|
| Oct. 28, 1952 | Interest prepaid by S.K._____ | $8,750.00 |
| Apr. 27, 1953 | Accrued interest _____ | 8,124.95 |
| Apr. 27, 1953 | Refund due S.K._____ | 625.05 |

LOAN FOR BANK OF AMERICA CD

| | | |
|---|---|---|
| Dec. 11, 1952 | Interest prepaid by S.K._____ | $15,000.00 |
| Nov. 27, 1953 | Accrued interest _____ | 14,833.35 |
| | Refund due S.K._____ | 166.65 |

In her joint income tax return for 1953, Sylvia reported long-term capital gains under section 117 from the sales of the 2 CD's in the total amount of $11,978.11, computed as follows:

| CD | Sale price | Purchase price | Long-term capital gain |
|---|---|---|---|
| Anglo-Calif. | $149,596.87 | $145,406.25 | $4,190.62 |
| Bank of America | 149,912.49 | 142,125.00 | 7,787.49 |
| Total | | | 11,978.11 |

In her joint return for 1953 (not at issue here), Sylvia reported as income $79.70, the amount of the refund she received in 1953 of the prepayments of interest. She reported the refund as income because she had deducted in the return for 1952 the full amount of the prepaid "interest," $23,750.

### Transactions of Cy Howard.

The transaction between Howard and CanFitz on July 24, 1952, involved 8 CD's having a total face value of $387,500. The CD's have been listed in a table set forth above. One CD was for $150,000; 2 CD's were for $50,000, each; 1 was for $37,500; and 4 were for $25,000, each. All were issued on July 25, 1952; all matured on July 20, 1953. In every respect, the form and steps followed were exactly the same as in the instance of the transactions with Sylvia Kaye except as to amounts. All of the CD's involved were held by the Cleveland Trust Company to secure notes of CanFitz given in connection with the creation of each CD. CanFitz gave formal notice to Cleveland Trust

that the CD's were carried for the account of a customer and that it had legal authority to hypothecate them.

In connection with Howard's purported purchase of each one of the 8 CD's, he did not pay CanFitz any amount at any time on the purchase price, and he did not give CanFitz any note for any alleged loan.

On or about July 25, 1952, the issuance date of each one of the 8 CD's, CanFitz recorded on its books that it had made loans to Howard in the entire amount of each CD, and that interest on each loan was charged in advance for 360 days at 10 per cent. The purchase price to Howard of each CD was 94¾ per cent of the face amount. Can-Fitz gave Howard its checks for the balance of each loan. The total amount of the so-called loans to Howard was $387,500; the total amount of the purchase price of CD's to Howard was $367,156.25; and the total amount of checks of CanFitz to Howard for the balance of the loans was $20,343.75, for which CanFitz sent him one check. The total amount of the payments by Howard as prepaid interest on the loans was $38,750, for which Howard sent one check to CanFitz. The check of CanFitz to Howard was dated July 25, 1952, and Howard's check to that firm bore the same date. Since Howard received $20,343.75 from CanFitz, he used out of his own cash a net amount of only $18,406.25 in payment of the charge for interest on the loans.

On its books, CanFitz entered $38,750 as "interest income." The following schedule summarizes the transaction covering the so-called loans to Howard to cover his purchases of 8 CD's:

LOANS OF CANFITZ TO CY HOWARD

| Date | Total loan [1] | Purchase price of CD's | Cash loan | Prepaid "interest" |
|---|---|---|---|---|
| July 25, 1952 | $150,000 | $142,125.00 | $7,875.00 | $15,000 |
| July 25, 1952 | 50,000 | 47,375.00 | 2,625.00 | 5,000 |
| July 25, 1952 | 50,000 | 47,375.00 | 2,625.00 | 5,000 |
| July 25, 1952 | 37,500 | 35,531.25 | 1,968.75 | 3,750 |
| July 25, 1952 | 25,000 | 23,687.50 | 1,312.50 | 2,500 |
| July 25, 1952 | 25,000 | 23,687.50 | 1,312.50 | 2,500 |
| July 25, 1952 | 25,000 | 23,687.50 | 1,312.50 | 2,500 |
| July 25, 1952 | 25,000 | 23,687.50 | 1,312.50 | 2,500 |
| Total | 387,500 | 367,156.25 | 20,343.75 | 38,750 |

[1] Face amount of each CD.

On June 30, 1953, about 20 days before the maturity date of each CD but more than 6 months from the dates of issuance and of Howard's "purchase," CanFitz sold the CD's for Howard's account and pursuant to his order, and sent Howard confirmations of the sales. CanFitz made the sales as broker and charged a commission for each sale. In each instance the selling price exceeded the purchase price to

Howard so that long-term capital gain was realized in the total amount of $19,076.31. CanFitz entered on its books in Howard's account credits for the net amounts of the selling prices against the loans. The total amount of the selling prices of the CD's was $386,-426.31; commissions totaled $193.75. The net amount of the sales prices, $386,232.56; was credited to the total of the loans, $387,500, and the balance per books due CanFitz was $1,267.44, which amount was paid by Howard.

Since each CD was sold a few days before its maturity date and the maturity date of the so-called loans to Howard, there was $2,045.23 of the amount paid by Howard as prepaid "interest" due him as unused "interest." CanFitz refunded that amount to Howard.

The following schedule shows the details of the sales of CD's on June 30, 1953, the gains, and of the closing out of Howard's account:

| Total loan | Net selling price | Balance due CanFitz on loans | Refund of prepaid "interest" | Gains from sales |
|---|---|---|---|---|
| $150,000 | $149,509.38 | $490.62 | $791.70 | $7,384.38 |
| 50,000 | 49,836.46 | 163.54 | 263.90 | 2,461.46 |
| 50,000 | 49,836.46 | 163.54 | 263.90 | 2,461.46 |
| 37,500 | 37,377.34 | 122.66 | 197.93 | 1,846.09 |
| 25,000 | 24,918.23 | 81.77 | 131.95 | 1,230.73 |
| 25,000 | 24,918.23 | 81.77 | 131.95 | 1,230.73 |
| 25,000 | 24,918.23 | 81.77 | 131.95 | 1,230.73 |
| 25,000 | 24,918.23 | 81.77 | 131.95 | 1,230.73 |
| 387,500 | 386,232.56 | 1,267.44 | 2,045.23 | 19,076.31 |

In his income tax return for 1953 (not at issue here), Howard reported as income $2,045.23, the refund he received in 1953, on the basis of having deducted in his 1952 return as "interest" the entire amount of $38,750 paid to CanFitz. Howard also reported in his 1953 return long-term capital gain from sales of CD's in the total amount of $19,076.31.

The respondent disallowed the deduction taken by Howard in his 1952 return for $38,750, as an interest deduction under section 23(b), on the ground that it did "not represent a proper deduction under the provisions of the Internal Revenue Code of 1939."

The parties have stipulated that neither of the petitioners involved here is a stockholder, director, or officer of CanFitz; that neither is related to any stockholder, director, or officer of CanFitz; and that neither is related to anyone who was a purchaser of any of the CD's involved in the 1953 sales transactions.

All of the CD's involved in the transactions of CanFitz with Sylvia Kaye and Cy Howard, hereinabove described, were presented upon maturity to the issuing banks for redemption by the Cleveland Trust Company. The parties have stipulated that such presentation of the

CD's by Cleveland Trust for redemption was made "for the account of the purchasers" involved when CanFitz made sales of the CD's in 1953 for the respective amounts of Sylvia Kaye and Cy Howard. The record does not show, however, who those "purchasers" were.

The Cleveland Trust Company applied the proceeds it received upon the redemption of all of the CD's against and in satisfaction of its loans in 1952 to CanFitz in the total face amount of the CD's, and thereupon returned the notes of CanFitz which it had given to evidence the loans.

The parties have stipulated as follows: The discount at which Treasury notes and other Treasury securities are issued, and the discount at which certificates of deposit are generally bought and sold, is directly related to the prevailing money market; that no banks or other financial institutions would loan funds to borrowers to be used to purchase either Treasury notes, other Treasury securities, or certificates of deposit at rates of interest equal to, or lower than, the current yield on such Treasury notes or other securities, or the yield on certificates of deposit based on their discounted purchase or sale price. Thus, the prevailing interest rates on borrowed funds secured by or to be used to purchase Treasury notes or other Treasury securities are always in excess of the prevailing yield on such Treasury notes or Treasury securities, and are always in excess of the prevailing yield on certificates of indebtedness.

The parties have stipulated, further, that the petitioners acknowledge that the 10 per cent rate of interest charged by CanFitz on the "loans" involved here "was in excess of the interest rates generally charged by banks on loans used to purchase U.S. Treasury Notes, or other Treasury Securities of early maturities, at all times material."

The transactions of Sylvia Kaye with CanFitz involving the loans to her in 1952 and sales in 1953 of 2 CD's resulted in her disbursement out of her own funds of a net amount of $10,980.19, as is shown by the following: The total net amount paid by Sylvia in 1952 out of her own funds to CanFitz to cover its charges for advance "interest" was $11,281.25, of which CanFitz made a refund of $791.70, in 1953, so that her final net disbursement for so-called "interest" was $10,489.55. In 1953, she paid CanFitz from her own funds $490.64, the amount due it after crediting loans of $300,000 with the 1953 net sales prices of the CD's, $299,509.36. Accordingly, she paid to CanFitz $10,980.19 of her own funds during the course of her account. Since she was not reimbursed in any respect for that expenditure, the transactions resulted in a total cost to her of $10,980.19. The above is shown by the following:

SYLVIA KAYE TRANSACTIONS WITH CANFITZ

*"Interest" payments:*

| | |
|---|---|
| 1952 charges of CanFitz as "interest"_____ | $23,750.00 |
| Received from CanFitz as part of "loan"_____ | 12,468.75 |
| Net payment of S.K. as "interest," 1952_____ | 11,281.25 |
| Refund from CanFitz, 1953_____ | 791.70 |
| Net amount paid by S.K. as "interest"_____ | 10,489.55 |

*"Loan" account:*

| | |
|---|---|
| 1952 "loans" by CanFitz_____ | 300,000.00 |
| 1953 credits, sales of CD's_____ | 299,509.36 |
| Balance due and paid by S.K._____ | 490.64 |

*Total net payments to CanFitz:*

| | |
|---|---|
| Net payments as "interest"_____ | 10,489.55 |
| Net payment on "loans"_____ | 490.64 |
| Total paid to CanFitz_____ | 10,980.19 |

The transactions of Cy Howard with CanFitz involving "loans" to him in 1952 and sales of 8 CD's in 1953 resulted in his disbursement out of his own funds of a net sum of $17,628.46, as is shown by the following: The total net amount paid by Howard in 1952 out of his own funds to CanFitz to cover its charges for advance "interest" was $18,406.25, of which CanFitz made a refund of $2,045.23, in 1953, so that his final net disbursement for so-called interest was $16,361.02. In 1953, he paid CanFitz from his own funds $1,267.44, the amount due it after crediting loans of $387,500 with the 1953 net sales prices of the CD's, $386,232.56. Accordingly, Howard paid CanFitz the total sum of $17,628.46, during the course of his account. Since he was not reimbursed in any respect for that expenditure, the transactions result in a total cost to him of $17,628.46. The above is shown by the following:

CY HOWARD TRANSACTIONS WITH CANFITZ

*"Interest" payments:*

| | |
|---|---|
| 1952 charges of CanFitz as "interest"_____ | $38,750.00 |
| Received from CanFitz as part of "loan"_____ | 20,343.75 |
| Net payment of C.H. as "interest," 1952_____ | 18,406.25 |
| Refund from CanFitz, 1953_____ | 2,045.23 |
| Net amount paid by C.H. as "interest"_____ | 16,361.02 |

*"Loan" account:*

| | |
|---|---|
| 1952 "loans" by CanFitz | $387,500.00 |
| 1953 credits, sales of CD's | 386,232.56 |
| Balance due and paid by C.H. | 1,267.44 |

*Total net payments to CanFitz:*

| | |
|---|---|
| Net payments as "interest" | 16,361.02 |
| Net payment on "loans" | 1,267.44 |
| Total paid to CanFitz | 17,628.46 |

The only issue is whether the payments made to CanFitz in 1952 by Sylvia and Cy Howard, $23,750 and $38,750, respectively, are deductible as interest on indebtedness under section 23(b), 1939 Code.

The respondent disallowed the claimed deductions on the ground that the transactions of each petitioner with CanFitz, apart from the admitted tax motive, were devoid of commercial or economic reality and, therefore, the so-called interest payments were not within the intendment of section 23(b). It is the respondent's position that the purported debts of each petitioner to CanFitz were lacking in substance and were no more than paper arrangements set up in accounting form on the books of CanFitz to give the semblance of loans for which interest was prepaid.

The petitioners argue that valid debts, legally incurred and enforcible, were created upon which they paid interest in advance. They contend that they individually entered into legal contracts with Can-Fitz to purchase intangible personal property, bank certificates of deposit, which CanFitz then owned; that certificates of deposit are marketable property; that a charge of 10 per cent for interest, the maximum legal rate of interest under the laws of California, was a reasonable rate of interest on loans which were in the amount of 100 per cent of the face value of the certificates; and that the certificates were collateral for the loans.

The general problem presented here has been considered by this Court and other courts in the following cases: *Eli D. Goodstein*, 30 T.C. 1178, affd. 267 F. 2d 127; *Sonnabend* v. *Commissioner*, 267 F. 2d 319, affirming a Memorandum Opinion of this Court; *Weller* v. *Commissioner*, 270 F. 2d 194, affirming 31 T.C. 33 and *W. Stuart Emmons*, 31 T.C. 26; *Broome* v. *United States*, 170 F. Supp. 613; and *Knetsch* v. *United States*, 272 F. 2d 200, affirming an unreported decision of the District Court for the Southern District of California. In all of the above cases, consideration was given to the well-established meaning of interest under the intendment of section 23(b); to the substance, as opposed to the form, of the particular transactions involved; to the principles established by *Gregory* v. *Helvering*, 293

U.S. 465; and to the necessity for carefully scrutinizing the whole transaction, from the beginning to the end, so that its true nature shall not be disguised by mere formalisms which exist solely to alter tax liabilities. See *Weller* v. *Commissioner*, *supra*. Having in mind the principles which were applied to the facts in the cases referred to above, we turn to examination of the facts in these cases.

The 10 certificates of deposit involved were issued by banks on the basis of deposits made by the Cleveland Trust Company, with its own funds, totaling $687,500, which amount was loaned by Cleveland Trust for the period of the certificates in the same amount, and Cleveland Trust held the certificates as collateral for the loans. The loaned funds were deposited to the credit of the Beverly Finance Company and the Bankers Discount Corporation who were the actual debtors and CanFitz merely acted as a broker for those companies pursuant to arrangements hereinbefore explained, under which CanFitz used its credit with and gave its notes to Cleveland Trust for the loans to the above-named clients for a charge to them. Consequently, the certificates of deposit were issued in CanFitz' name, as the depositor, but they were made payable to a nominee of Cleveland Trust. Cleveland Trust would not release and deliver the hypothecated certificates without repayment of the loans in the above total sum, and, therefore, the petitioners could not possess and exercise dominion and control over them unless they made actual payments of funds to Cleveland Trust. By the same token, the certificates could not be presented for redemption to the issuing banks by anyone unless they were released from pledge.

When CanFitz entered into the several transactions with the petitioners, it did not pay over $687,500 to them and it had no intention of doing so. Rather, it was intended that the transactions of sales *to* the petitioners would be reversed after 6 months, and before the maturity of the certificates, by means of sales *by* them so that, under the plan, the petitioners never would take possession of and exercise dominion and control over the certificates. Petitioners did not give notes to CanFitz for $687,500, or any other amount, and this could not be expected, under the plan, as moneys were not received by them. Neither did CanFitz repay $687,500 to Cleveland Trust Company. Consequently, the certificates continued to be pledged to Cleveland Trust; they were held by it or its nominee, R. M. Bourne & Co. (to whose order they were payable); and they were not held by CanFitz to secure purported loans to the petitioners.

These facts and circumstances raise the question of the reality and substance of the alleged loans aggregating $687,500 to the petitioners. Compare *Eli D. Goodstein*, *supra* at 1187. Although we do not have the benefit of testimony of a representative of CanFitz, or of the

Lefkowitz accounting firm, or of the petitioners, it is stipulated that CanFitz' loans to the petitioners were in the form of "margin" accounts in the entire face amounts of the CD's; that CanFitz recorded on its books and records that it had made loans in the face amount of each CD, at the interest rate of 10 per cent, and that CanFitz notified by letters each petitioner of such purported loans. It is stipulated, further, in the notification letters, CanFitz advised petitioners "that each of the particular CD's would be carried by it [CanFitz] as collateral against such loans," which, as has been noted above, was not an accurate or true representation and, in fact, was not done and could not have been done. Finally, after 6 months, at the end of the transactions when, in 1953, the certificates purportedly were sold by the petitioners, credits were made to their respective "loan" accounts on CanFitz' books which wiped out the major part, practically all, of the so-called loans. The petitioners have not divulged any information about the sales of the CD's for their accounts in 1953 other than that they are not "related to any purchaser of the CD's involved."

The petitioners concede in their stipulations that the transactions entered into with CanFitz followed the pattern and steps of a plan evolved by CanFitz for "achieving tax-savings for high-bracket taxpayers" which was presented by CanFitz to the Lefkowitz accounting firm which, in turn, communicated the plan to each petitioner. It is evident from the entire record that all of the steps taken by the petitioners and CanFitz were pursuant to a preconceived plan. This much is admitted by petitioners. It is also evident and we conclude from the whole record that the purported loans totaling $687,500 were mere paper transactions only involving no more than accounting entries on CanFitz' books; that it was not intended that there would be actual loans of funds to the petitioners; that there was no substance to the alleged loans; that neither one of the petitioners risked any borrowed money; and that the relationship between each petitioner and CanFitz was not one of borrower and lender. Compare *Goodstein* v. *Commissioner*, 267 F. 2d 127, and *Broome* v. *United States*, *supra*. Bookkeeping entries are not conclusive. *Doyle* v. *Mitchell Bros. Co.*, 247 U.S. 179.

The transactions involved *in form* sales of CD's to the petitioners, purported loans for the purpose of financing the purchases, and finally sales of the CD's which provided for the most part repayment of the purported loans. And *in form*, each petitioner paid interest, in advance, to CanFitz on the purported loans. But although the payments made in 1952 appear to constitute interest within the meaning of section 23(b), deductions cannot be allowed for such payments under section 23(b) because there was no borrower-lender relationship, and there was no substance to the transactions insofar as they

gave rise *in form*, to loans. Insofar as they gave rise to the payment of interest, the transactions were shams. It is our conclusion that the payments for which deductions in 1952 are claimed, $23,750 by Sylvia, and $38,750 by Howard, were not founded in actual indebtedness of the petitioners to CanFitz in the respective amounts of $300,000 and $387,500. *Brown* v. *Commissioner*, 241 F. 2d 827; *Broome* v. *United States, supra;* and *Goodstein* v. *Commissioner, supra.* What petitioners paid CanFitz was not an amount paid "for the use of borrowed money," *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552, 560. "Although an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness' within the meaning of section 23(b). Nor are all carrying charges 'interest.' " *Deputy* v. *duPont*, 308 U.S. 488, 497–498.

The transactions of the petitioners, considered as a whole, step by step from beginning to end, had no independent economic or commercial purpose apart from anticipated tax benefits to which the sham activities were merely subsidiary. The transactions represented solely a "contrivance" to the end that petitioners would acquire interest deductions. Although the arrangements were in the guise of purchases of CD's for resale after 6 months to obtain capital gains, they were in reality a scheme to create artificial loans for the sole purpose of making the payments by the petitioners appear to be prepayments of interest in 1952. The transactions would not have been possible in ordinary, arm's-length, commercial dealings. They were possible only because CanFitz had complete control over them from beginning to end and was willing to enter into them for a "fee" which, in the end, it received from each petitioner, namely, a net sum of $10,980.19 from Sylvia, and $17,628.46 from Howard.

Illustrative of the artificiality of the arrangements, from the standpoint of bona fide business dealings, are the following: CanFitz charged petitioners 10 per cent interest per annum on their margin accounts at a time when prevailing interest rates on similar accounts were from 4 to 5 per cent. The record shows that rates normally charged by banks in 1952 on loans secured by Government securities were slightly less than 4 per cent. The only reasonable explanation for the excessive rate of 10 per cent charged by CanFitz is that it was expected to provide a much larger interest deduction, and, also, that it was expected that the spread between the 10 per cent rate and the 5.25 per cent discount in the so-called "purchase price" of the CD's would be more than offset by the anticipated tax saving to be created by the larger interest charge. Furthermore, the record shows that the purported "loans" by CanFitz of the face amounts of the CD's, $687,500, exceeded the then present value of the CD's, and that the CD's were the type of security with respect to which lenders

typically would not lend 100 per cent of the face value and would probably lend only as much as 95 per cent thereof. The only reasonable explanation for CanFitz' "loaning" petitioners the face amount of the CD's (about 105 per cent of their normal sale price), rather than an amount below their face amounts, is that the amounts of the loans in excess of the purchase price of the CD's were intended to reduce by about one-half each petitioner's cash outlay in entering into the transactions. Although petitioners contend that their respective "interest" payments in 1952 amounted to $23,750 and $38,750, Can-Fitz advanced cash to each in the amounts of $12,468.75 and $20,-343.75, so that Sylvia and Howard paid from their own funds only $11,281.25 and $18,406.25, respectively.

Interest, under the intendment of section 23(b), is confined to payments for the use of money. Since no money or other economic benefit was advanced by CanFitz to the petitioners and the purported loans were shams, the payments in question were not in substance interest on indebtedness within the scope of section 23(b). The respondent's disallowances of the claimed deductions are sustained.

*Decisions will be entered for the respondent.*