**L. LEE STANTON AND HELEN LA FETRA STANTON, PETITIONERS, _v._ COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.**

Docket No. 68914.   Filed April 7, 1960.

_Hugh Satterlee, Esq._, and _Rollin Browne, Esq._, for the petitioners.
_Emil Sebetic, Esq._, for the respondent.

1

4

6

MURDOCK, *Judge:* Lee sold the C.I.T. notes in 1953 and reported for that year on that transaction a long-term capital gain. The Commissioner, in determining the deficiency for that year, taxed the gain as interest instead of allowing it to be included in the sales proceeds of the notes for tax purposes. He eliminated the gain as a long-term capital gain. The Commissioner's action is supported by the decision of this Court in *F. Rodney Paine*, 23 T.C. 391. Cf. *Charles T. Fisher*, 19 T.C. 384, affd. 209 F. 2d 513, certiorari denied 347 U.S. 1014, and *Arnfeld* v. *United States*, 163 F. Supp. 865. The *Paine* case was reversed by the Court of Appeals for the Eighth Circuit, one Judge dissenting, see 236 F. 2d 398, but the grounds on which it was reversed are not present in this case.

The petitioners argue that our decision in *George Peck Caulkins*, 1 T.C. 656, affd. 144 F. 2d 482, is in direct conflict with our decision in the *Paine* case, but this Court in the *Paine* case explained how the two are distinguishable. The grounds given there for distinguishing the *Paine* and *Caulkins* cases would likewise apply to distinguish the present case from the *Caulkins* case. Cf. *Commissioner* v. *Morgan*, 272 F. 2d 936, reversing 30 T.C. 881. The Commissioner's determination on this issue has not been shown to have been in error.

The only other issue that need be decided is whether the Commissioner erred in disallowing deductions for 1952 and 1953 for interest paid in those years on indebtedness. Section 23(b) of the Internal Revenue Code, applicable to all years involved herein, provides that in computing net income there shall be allowed as a deduction—

All interest paid * * * within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally

subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter.

No contention is made or could be made that the exception quoted above applies here, nor does section 24(a)(6) apply. Those are the only exceptions to the general rule allowing the deduction of "all interest paid * * * on indebtedness." Congress having enacted the only exceptions it desired to make, the maxim of interpretation, "*Inclusio unius est exclusio alterius*" applies, e.g., Congress intended no other exception or limitation on the deductibility of interest on indebtedness. All interest paid within the taxable year on genuine indebtedness of any other kind thus entitles a cash basis taxpayer to a deduction of the amount of interest paid. The Commissioner here concedes, as he must, "the reality and validity of the series of transactions." Thus the payments of principal and interest were enforcible. Cf. *W. S. Gilman*, 18 B.T.A. 1277, affd. 53 F. 2d 47; *William Park*, 38 B.T.A. 1118, affd. 113 F. 2d 352. Congress has indicated that this deduction is not dependent in any other way upon the purpose or motive of the borrower, or the use made of the borrowed funds. Lee borrowed the money here involved for a purpose not prohibited by any provision of the Code and is entitled to the deductions claimed.

$56,387.50 of the borrowed money was not used to buy the Treasury notes. Actually, Lee did not use the rest of it for any evil, immoral, or illegal purpose, if that makes any difference. Congress has included no requirement in the Code that the borrowed money be used in connection with a transaction entered into for profit or that it cannot be borrowed for personal or non-business purposes or used in a transaction involving tax benefits, cf. *Commissioner* v. *Park*, 113 F. 2d 352, and the Tax Court has no authority to write or read such requirements into the law.

The legislative history of section 23(b) shows that Congress has repeatedly considered and ultimately rejected limitations somewhat comparable to the one now urged by the Commissioner. The House, for example, proposed to restrict the interest deduction in the 1924 Act to interest paid or incurred in carrying on a trade or business and other interest which, when added to nonbusiness losses, exceeded tax-exempt interest received. The Senate struck this out and inserted a limitation on indebtedness incurred or continued for the purpose of evading the payment of taxes when the purchaser carried tax-exempt securities other than certain United States obligations. But the reference to "indebtedness incurred or continued for the purpose of evading the payment of taxes" was stricken out in conference. The House proposed another limitation for the 1926 Act, but again the Senate refused and the House concurred. The 1932 Act broadened the restriction to deny deduction for in-

terest on indebtedness incurred or continued in connection with the purchasing or carrying of an annuity. The House proposed to broaden the restriction in the 1934 Act, but the Senate refused and also struck out all reference to annuities. The House at the same time proposed in section 24(a)(5) to disallow any deduction allocable to any class of income wholly exempt from tax, but the Senate amended to preclude the application of this provision to the deduction for interest and the House accepted the amendment. See also Revenue Act 1921, section 206(a)(3) and (4), and Revenue Act 1924, section 208(a)(3), (5), and (6), which imposed certain restrictions afterwards dropped from the law and never reenacted. Cf. sec. 24(a)(5) and (6) of the 1939 Code.

The Internal Revenue Code imposed heavy taxes upon Lee and he sought a legal way within the provisions of the Code to make a profit for himself after taxes, the only kind of profit which can do any taxpayer any good. His Treasury note transactions would have been profitable before taxes, if events had happened as he anticipated they would at the time of entering into the transactions. He had reasons, which seemed sufficient to him at the time, to believe that the out-of-town banks would allow him to terminate his loans with the return to him by the banks of the unearned interest at any time he chose to sell the Treasury notes and pay off his bank loans, as the New York banks had done. A deduction for the actual interest which he paid over the term of the loans could not have been denied to him, if that had happened. The taxability of the excess of the amount realized from the sale of the Treasury notes in 1954 over their cost is not an issue in this case, but it was a transaction entered into for profit, and which resulted in a profit, if that is material here. What reason is there for penalizing Lee and deviating from the plain words of the Internal Revenue Code merely because the unexpected action of the banks wiped out Lee's real gain by requiring him to pay about $126,000 of additional interest?

All of Lee's borrowings involved herein were genuine and resulted in real indebtedness within the meaning of section 23(b). There was no collusion. The lenders actually advanced the money borrowed for Lee's use. The money was used in the outright purchase of securities at market. The securities became the property of Lee. They were held as security by the lenders of the money. Lee had all the benefits and risks of ownership. All dealings were "at arm's length." Once he entered into the transactions he was required to do all that he did do, and no step which he took was lacking in substance or legal effect. He was strictly within the law at all times, and the interest deductions which he took for 1952 and 1953 were in exact accordance with the express provisions of section 23(b). The

Commissioner concedes all of this. How then does the Commissioner attempt to justify his disregard of the plain provisions of the Internal Revenue Code whereby he taxes interest received and capital gains on the transactions but denies deductions for all interest paid? He says:

This Court has already approved determinations of respondent comparable to the one at issue herein. Cf. *Eli D. Goodstein* (1958) 30 T.C. [1178], No. 124, aff'd (CA 1, 1959) —— F. 2d ——, 3 A.F.T.R. 2d 1500; *Abraham M. Sonnabend*, T.C. Memo. 1958–178, aff'd per curiam (CA 1, 1959) —— F. 2d ——, 3 A.F.T.R. 2d 1505; *John Fox*, T.C. Memo. 1958–205; *Matthew M. Becker*, T.C. Memo 1959–19; *George G. Lynch* (1959) 31 T.C. [990], No. 98 (On appeal); *Leslie Julian* (1959) 31 T.C. [998], No. 99 (On appeal); *Egbert J. Miles* (1959) 31 T.C. [1001], No. 100 (On appeal); See also *W. Stuart Emmons* (1958) 31 T.C. [26], No. 4 (On appeal). Respondent submits that the principles applied in the above decisions are controlling and dispositive of the case at bar.

\* \* \* \* \* \* \*

In the light of the foregoing discussion, respondent submits that as a matter of substantial commercial reality, Stanton did not purchase any CIT Notes and Treasury Notes, incur any indebtedness, pay any interest, or sell any CIT Notes and Treasury Notes, which were significant or recognizable for tax purposes. *George G. Lynch, supra; Egbert J. Miles, supra; W. Stuart Emmons, supra.*

The facts in each of the cited cases distinguish it from the present case. The *Emmons* case bears no resemblance to the facts here. The leading case cited is *Eli D. Goodstein*, 30 T.C. 1178, affd. 267 F. 2d 127, but important differences rob it of all effect as an authority here. The alleged *Goodstein* transactions were collusive shams throughout arranged by Eli Livingstone.[1] The Treasury notes were "purchased" and "sold" practically as one transaction in which no real money passed on behalf of the taxpayer. The alleged lender corporation had no money to lend. No Treasury notes were held as security or otherwise by that corporation. Goodstein was not the owner of any Treasury notes during the time the "loan" was supposed to be in effect. He was not entitled to receive and did not receive the benefit of any interest on Treasury notes. There was no indebtedness of $10 million. The whole matter of "interest" was merely an empty bookkeeping device to create the illusion of indebtedness, interest, and long-term capital gain. However, the Court in affirming the *Goodstein* case, 267 F. 2d 127, expressed the thought that Goodstein, despite the recognized shams, might be entitled to a deduction for some loss in a later year not before the Court. See also *Lynch* v. *Commissioner*, 273 F. 2d 867, affirming the *Lynch* and *Julian* cases (*George C. Lynch*, 31 T.C. 990, *Leslie Julian*,

---

[1] Statements in dissents hereto that Livingstone had something to do with this case are improper inferences from Stanton's testimony which I alone heard.

31 T.C. 998), both of which involved similar shams arranged by Livingstone.

The Commissioner quotes language from the Tax Court opinion in the *Egbert J. Miles* case (31 T.C. 1001) to the effect that "if petitioner did purchase the bonds and incur an indebtedness he did so but for one reason, to realize a tax deduction" and that being so, the interest was not deductible within the intendment of section 23 (b). That part of the opinion was not necessary in denying the deduction since the facts disclosed a repetition of the collusive shams in the *Goodstein* case. The Court of Appeals for the Second Circuit, in affirming the *Lynch* and *Julian* cases, did not rely on any such reasoning and did not rely upon *Gregory* v. *Helvering*, 293 U.S. 465, which, it said, "the government construes as establishing a doctrine forbidding generally the recognition for tax purposes of transactions entered into for the sole purpose of tax avoidance." It relied instead "on the more fundamental ground" that there was no genuine indebtedness. The *Goodstein, Julian, Lynch,* and *Miles* cases were all correctly decided on the "fundamental ground" that there was no real indebtedness in any of them but merely collusive shams to create a supposed appearance of indebtedness on which supposed interest was paid. Anything contrary to the holding here was not necessary in the *Lynch, Julian,* and *Miles* cases and is not binding in this case although those cases and the *Goodstein* case were correctly decided on their own facts.

*Knetsch* v. *United States*, 272 F. 2d 200, certiorari granted 361 U.S. 958, decided by the Court of Appeals for the Ninth Circuit, involved a transaction in which the taxpayer purchased 2½ per cent annuity savings bonds from a life insurance company by borrowing the necessary money from the life insurance company at 3½ per cent. The Court affirmed the judgment of the District Court which had held that the amount paid to the insurance company was not interest in fact but the purchase price of a tax deduction. The Court of Appeals said it agreed with the opinion in *Weller* v. *Commissioner*, 270 F. 2d 294. The *Weller* case affirmed 31 T.C. 33 and also affirmed *W. Stuart Emmons*, 31 T.C. 26. The taxpayers in the *Emmons* and *Weller* cases had purchased annuity contracts and borrowed money from banks to prepay at a discount all future premiums and then received the loan value which the contract would have accumulated up to the time the prepaid premiums would be due. They then used a part of this money to pay off the loans at the banks. *The interest on the bank loans was not in controversy.* The taxpayers were disallowed claimed deductions for "interest" on the amounts they allegedly borrowed from the insurance companies, since no money was in effect loaned to them

by the insurance companies. The Court of Appeals for the Fifth Circuit in *United States* v. *Bond*, 258 F. 2d 577, in a situation similar to that involved in the *Knetsch* case, held that the interest on the borrowing from the insurance company was deductible. The payments involved in all of the above four cases were on alleged loans from the insurance companies so that the whole transaction in each case was between the taxpayer and the insurance company. No genuine indebtedness existed on which interest was paid. Such cases are distinguishable factually from the present case. The present taxpayer bought securities on the open market and borrowed money from banks without any collusion to avoid income taxes between him and any person with whom he dealt. His indebtedness was genuine and section 23(b) allows a deduction for interest paid on such indebtedness.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

OPPER, *J.*, dissenting: While I agree with much that is said by my brothers Bruce and Pierce, it seems to me this case should be decided squarely on the authority of *George G. Lynch*, 31 T.C. 990, and *Leslie Julian*, 31 T.C. 998, both affirmed (C.A. 2) 273 F. 2d 867, and *Egbert J. Miles*, 31 T.C. 1001, and what we said there. Only by repudiating one of the two grounds on which those cases rested can the present result be reached. The attempt to distinguish these and other cases by applying to them such unmeaningful labels as "sham" and "collusive" avoids the true crux of the problem. The fact that there was a "real" bank, or that there was actual liability on the notes, which were not of the nonrecourse character, will not do as a distinction.

The present facts are, of course, not identical with those in all of the cases in this field. That there should be variations in detail from case to case is no more than can be expected. However, in *W. Stuart Emmons*, 31 T.C. 26, and *Carl E. Weller*, 31 T.C. 33, both affirmed (C.A. 3) 270 F. 2d 294, the insurance company was a "real" insurance company, and in *Broome* v. *United States*, (Ct. Cl., 1959) 170 F. Supp. 613, one of the notes had no "nonrecourse" provision. In *Eli D. Goodstein*, 30 T.C. 1178, affd. (C.A. 1) 267 F. 2d 127, and *Danny Kaye*, 33 T.C. 511, there is no indication that the notes were not actual liability notes.

These transactions had no genuine business, borrowing, or investment purposes. They were, in my opinion, not of the kind to which Congress intended the respective statutory provisions to apply. And the fact that a man named Livingstone may not have been involved

is certainly no basis for erecting a principle of law—although the fact appears to be that, to some extent, his influence was also present here.

The various elements which we observe in the present transactions, and which in one form or another exist in the other cases referred to, are the symptoms rather than the disease. The disease is lack of reality; the symptoms, which one would not necessarily expect to find in such a case, are the various steps which are either omitted entirely or taken in so offhand [1] a way that they are obviously mere window-dressing to conceal the lack of reality behind. But if every "i" were correctly dotted and every "t" meticulously crossed, the result would not be different. The transaction would remain one which it is not the purpose of the tax law to recognize. *Gregory* v. *Helvering*, 293 U.S. 465.

I respectfully dissent.

HARRON, *J.*, agrees with this dissent.

---

BRUCE, *J.*, dissenting: I do not agree with the conclusions of the majority respecting the transactions herein involving the C.I.T. notes, and accordingly dissent.

In my opinion the Internal Revenue Code was, and is, intended to apply to transactions founded upon economic reality. Transactions which, standing alone and without regard for tax considerations, are not economically sound and are engaged in solely for the purpose of creating tax deductions which by means of the interplay between various sections of the Code will result in "tax-free income," are lacking in economic reality and, in my opinion, are not within the intendment of the taxing statute. Consequently such transactions should be ignored for tax purposes.

It has long been recognized that transactions which may be valid and enforcible between the contracting parties from a commercial or property law standpoint may, nevertheless, be so lacking in economic reality as to be entitled to no recognition for income tax purposes. Cf. *Gregory* v. *Helvering*, 293 U.S. 465; *Helvering* v. *Clifford*, 309 U.S. 331; *Higgins* v. *Smith*, 308 U.S. 473.

In *Commissioner* v. *Transport Trad. & Term. Corp.*, 176 F. 2d 570, 572, reversing 9 T.C. 247, certiorari denied 338 U.S. 955, the Second Circuit Court of Appeals stated that the doctrine of *Gregory* v. *Helvering* was not limited to consideration of corporate reorganizations but had a much wider scope:

---

[1] Petitioner's failure to take the trouble to reduce to writing his agreements with the banks, or even to inquire as to their practice, indicates to me a lack of interest inconsistent with an operation having economic reality.

it means that in construing words of a tax statute which describe commercial or industrial transactions we are to understand them to refer to transactions entered upon for commercial or industrial purposes and not to include transactions entered upon for no other motive but to escape taxation. * * *

In *Gilbert* v. *Commissioner*, 248 F. 2d 399, 411 (C.A. 2), Judge Learned Hand stated:

If, however, the taxpayer enters into a transaction that does not appreciably affect his beneficial interest except to reduce his tax, the law will disregard it; for we cannot suppose that it was part of the purpose of the act to provide an escape from the liabilities that it sought to impose. * * *

These principles have recently been applied in a number of cases strikingly similar to the instant case. In *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3), affirming 31 T.C. 33 and *W. Stuart Emmons*, 31 T.C. 26, and *Knetsch* v. *United States*, 272 F. 2d 200 (C.A. 9), certiorari granted 361 U.S. 958, deductions for amounts paid to insurance companies as interest on loans on annuity policies were held lacking in commercial substance and therefore not allowable. But cf. *United States* v. *Bond*, 258 F. 2d 577 (C.A. 5). In *Eli D. Goodstein*, 30 T.C. 1178, affd. 267 F. 2d 127 (C.A. 1); *George G. Lynch*, 31 T.C. 990, and *Leslie Julian*, 31 T.C. 998, both affirmed sub nom. *Lynch* v. *Commissioner*, 273 F. 2d 867 (C.A. 2); *Egbert J. Miles*, 31 T.C. 1001 (on appeal); *Danny Kaye*, 33 T.C. 511; and *Broome* v. *United States*, 170 F. Supp. 613 (Ct. Cl., 1959), the purchases of notes with borrowed funds for which they were posted as collateral, where the evident purpose was merely to create tax deductions, were ignored as transactions devoid of substance and interest on the loans was held not to be deductible.

In my opinion, the purchase of the C.I.T. notes in December 1952 is nothing but a dressed-up Goodstein transaction, the only difference being (1) that a "gimmick man" like Livingstone was not involved, and (2) that petitioner borrowed money from legitimate lending institutions instead of a Livingstone finance company. Although the "collusive sham" of the *Goodstein*, *Lynch*, and *Julian* cases is not present in the instant case, the transaction was no less a "sham" for income tax purposes. There is no doubt that petitioner would not have purchased the C.I.T. notes in 1952 had he not been able to create a tax benefit as a result of the interplay between the capital gain and interest deduction provisions of the Code. This conclusion is inescapable from the majority's finding of fact that "Lee anticipated that the interest he would have to pay on the loans would exceed the gain he would have on the notes but he would have a net gain after taxes from the transaction." It is quite clear that without the favorable tax impact the purchase of the C.I.T. notes could have resulted in nothing but a loss. Accordingly the transactions involving the C.I.T. notes which gave rise to petitioner's in-

terest expenditures are obviously lacking in economic reality and are not, in my opinion, within the intendment of the statute.

Needless to say, contrary to the views expressed by the majority herein, I do not regard anything that was said in the *Miles* case, *supra*, as being either inappropriate or unnecessary. In that case the evidence was insufficient to establish whether or not the transactions really occurred, and our opinion was based in part upon the assumption that they did occur and that legally enforcible rights were created. Accordingly, the language criticized was not mere *dictum*. In *Woods* v. *Interstate Realty Co.*, 337 U.S. 535, the Supreme Court stated that "where a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*."

For the reasons discussed above, I respectfully dissent from the opinion of the majority herein, particularly with respect to the C.I.T. note transactions.

HARRON, J., agrees with this dissent.

---

PIERCE, J., dissenting: I respectfully dissent from the Court's conclusions and holdings with respect to the principal issue, wherein it rejected the Commissioner's determination that petitioner is not entitled to the benefit of the interest deduction provision of section 23(b) of the 1939 Code, in connection with his transactions involving the C.I.T. notes and the United States Treasury notes.

(1) This case, in my view, is one of major importance in the administration of our Federal income tax system. It presents squarely the question: Whether a taxpayer who is faced with large surtax liabilities under the income tax statutes, may successfully contrive to reduce such potential tax liabilities, at such time or times and by such amounts as he may himself elect, through use of preconceived step-by-step transactions which are not entered into for any business, investment, or personal purpose whatsoever, other than to avoid income taxes; which in themselves are not intended or expected to produce any gain, profit, or income, but rather are expected to produce losses; and from which the only benefit must come from an interplay of the provisions of the tax statutes, and from severing the "costs" and outlays for such transactions from the proceeds thereof, and then deducting such "costs" against the taxpayer's gross income from other sources, to which the anticipated large surtaxes would otherwise be applicable.

The nub of such prearranged step-by-step transactions is to make arrangements with banks, at a relatively small "cost" or outlay by the taxpayer, for short-term "loans" aggregating several million dollars, which are rendered practically "risk proof" both to the

banks and to the taxpayer, by the following other steps of the preconceived plan: (1) Arrangements are made for the banks to immediately apply the amounts of such loans in payment for certain readily marketable investment notes of exceedingly high quality, which yield little or no interest and are therefore selling at a discount, but which have short-term maturities and will appreciate in value as they approach the early maturity dates; and further (2) for the taxpayer to prepay to the banks the "interest cost" of the loans to their maturities, authorize the banks to retain and apply all interest which may accrue on the securities during the periods of the loans, and also authorize the banks to satisfy the remaining principal out of the proceeds from sale of the securities at the conclusion of the entire transaction. Thus the banks will have on hand at all times, an amount represented by the prepaid interest and the value of the readily marketable high-grade securities, which will aggregate more than 100 per cent of the amounts of the loans. The period of the loans is arranged to extend for at least 6 months, so that capital gain benefits may be claimed by the taxpayer on the proceeds from disposition of the securities. And arrangements also are made for the loans to begin in one taxable year and end in another, so that the prepayments of interest and the receipts from disposition of the securities will not be reportable on any one income tax return of the taxpayer.[1]

With these preliminary steps for elimination of risk having been taken care of, little remains to be done, except for the taxpayer to set up the transaction on his income tax returns.

In the C.I.T. transaction here involved, petitioner prepaid approximately $144,000 "interest cost" on loans aggregating $8,888,925, for the privilege of picking up appreciation on the pledged securities, in the lesser amount of about $107,450. He conceded on cross-examination, that he anticipated suffering an economic loss from the transaction (which mathematically had to be true); and the amount of this loss was about $36,500. However, the mechanism by which he expected to convert this loss into a tax advantage, was this: He severed his above-mentioned "interest cost" of the transaction from the anticipated appreciation on the C.I.T. notes, instead of offsetting one against the other to reflect his above-mentioned economic loss; and he then applied such "costs" as a deduction against

---

[1] Another feature of petitioner's C.I.T. transaction was his arrangement to "sell" the notes on dates which ranged from 4 to 6 days prior to the notes' maturities. It is obvious that few assignees, other than brokers interested in handling charges, would pay out approximately $9 million merely to receive less than 6 days' appreciation on the notes (which this Court, under the other issue of this case, has held to be ordinary income). Such transparent attempt to convert ordinary income into capital gain, is substantially the same device which was employed in the recent case of *Commissioner* v. *Phillips*, 275 F. 2d 33 (C.A. 4), reversing 30 T.C. 866.

his gross income from other sources, to which the high surtaxes would otherwise be applicable. Thus, assuming that his surtax rate would otherwise have been about 75 per cent, he estimated that the actual cost to him of the transaction, after receiving the anticipated tax benefits from deduction of the $144,000 prepaid "interest," would be only 25 per cent thereof or about $36,000. He further anticipated that the $107,450 appreciation on the pledged securities would be taxed at the 25 per cent capital gains rate, so he could retain, after taxes, 75 per cent thereof or about $80,000. Accordingly, he concluded that from the entire step-by-step transaction, he would, if his plan were successful, not only obtain the valuable tax deduction of about $144,000, but also actually make approximately $44,000 (being the difference between the $80,000 retained after taxes out of the appreciation realized from the securities, and the $36,000 representing the "net cost" to him of carrying out the transaction). By repeating this process from time to time, or by increasing the amounts of the "loan" transactions, he could practically "write his own ticket" as to income tax liabilities. He was, in substance, purchasing income tax deductions.

The United States Treasury note transaction was of substantially the same character. As to this, petitioner arranged with four banks for loans aggregating $5 million which were to bear interest at 3½ per cent to their due date of March 15, 1955, in order to carry 1½ per cent Treasury notes that were to mature on the due date of the loans. It was realized that the net 2 per cent "interest cost" of carrying the transaction to its conclusion would exceed the proceeds to be derived therefrom (the appreciation of the Treasury notes to their maturity) ; but the benefits were intended to be derived, as in the case of the C.I.T. notes, from deducting the "interest cost" from the petitioner's income from other sources. In this transaction, the petitioner contended that he might have derived an economic gain, if he could have sold the Government notes prior to their maturity and could have obtained a refund from the banks of part of the "interest" which he had prepaid. However, he had no legal right to obtain such an adjustment from the banks, and all four banks refused to terminate the transaction prior to its maturity, without being compensated therefor. Thus, the transaction still produced an economic loss.

(2) The record in the instant case clearly establishes that the present transactions were not unique to the petitioner, and that they were not of the same character as those in which he normally engaged.

Prior to the trial herein, counsel for both parties represented to this Court on motion, that this was a "key case"; and that it had

been selected for trial out of a group of 13 cases pending before this Court, in which the taxpayers were represented by the same counsel, and in which there were common issues. Pursuant to the motion, this "key case" was advanced for trial.

Petitioner had engaged in financial business for at least 36 years; but he conceded on cross-examination that he had never, prior to the years involved, entered into any transaction involving the type of arrangement here presented.

When petitioner was asked how he became aware of this type of transaction, he replied that it was "common talk around Wall Street"—which tends to indicate that transactions of this character were sufficiently unusual to stimulate discussion even in a major financial center.

Other statements of petitioner on cross-examination show that the present transactions were entered into by petitioner following a discussion with a man named Livingstone, who was the architect of similar transactions involved in the "so-called 'Livingstone' cases." [2] Petitioner acknowledged that Livingstone came to his office "a short time prior" to the time when he (petitioner) entered into the present C.I.T. note transactions; and that Livingstone there described to petitioner and his partners the type of transactions involving Treasury notes which he had himself entered into.

In addition to petitioner's entering into both the C.I.T. note transactions and the Treasury note transactions here involved, one of petitioner's partners entered into a C.I.T. note transaction, and more than half of the 18 partners of petitioner's firm entered into Treasury note transactions.

Thus, the present case is of more widespread importance to the Federal tax system than might appear on first impression.

(3) During the past 2 years, a multiplicity of cases involving tax avoidance by use of the interest deduction provisions of section 23(b), have been decided by this and other courts. These include: *Eli D. Goodstein*, 30 T.C. 1178, affd. 267 F. 2d 127 (C.A. 1); *George G. Lynch*, 31 T.C. 990, affd. 273 F. 2d 867 (C.A. 2); *Leslie Julian*, 31 T.C. 998, affirmed sub nom. *Lynch* v. *Commissioner, supra* (C.A. 2); *Sonnabend* v. *Commissioner*, 267 F. 2d 319 (C.A. 1), affirming T.C. Memo. 1958-178; *Egbert J. Miles*, 31 T.C. 1001, on appeal (C.A. 2); *John Fox*, T.C. Memo. 1958-205; and *Matthew M. Becker*, T.C. Memo. 1959-19. Also, the Court of Claims recently decided a similar case, *Broome* v. *United States*, 170 F. Supp. 613, in which that court

---

[2] This nickname of "Livingstone cases" was employed in petitioner's brief; and it has reference to such cases as the *Goodstein, Lynch, Julian, Sonnabend, Broome, Miles, Fox,* and *Becker* cases, which are hereinafter mentioned. The nickname arises from the fact that in all these cases, the tax avoidance plans involved were developed by M. Eli Livingstone, whose activities are described in said cases.

expressly approved of the views of this Court in the *Goodstein* case, *supra.* See also *W. Stuart Emmons*, 31 T.C. 26, affirmed sub nom. *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3) ; and *Knetsch* v. *United States*, 272 F. 2d 200 (C.A. 9), certiorari granted 361 U.S. 958, in which the court affirmed the judgment of the District Court in which it was held that the "alleged interest was not interest in fact, but the purchase price of a tax deduction."

All these cited cases, though they presented variations of fact, detail, and approach, involved the same basic question here presented. All were decided adversely to the taxpayer. All reflected (to use the phraseology of Justice Cardozo in *Burnet* v. *Wells*, 298 U.S. 670) "the Government's endeavor to keep pace with the fertility of invention whereby taxpayers had contrived to * * * be relieved of the attendant [tax] burdens." See also in this connection: *Helvering* v. *Gregory*, 69 F. 2d 809 (C.A. 2), affd. 293 U.S. 465; and *Helvering* v. *Clifford*, 309 U.S. 331.

(4) I believe that it was never intended that the Internal Revenue Code should be employed as a vehicle by which high-income taxpayers might, through transactions like the present, reduce or indeed eliminate their share of the Federal tax burden. The purpose of the Code is to provide the Government with needed revenues through taxation of gains, profits, and income; and it should not be presumed to bear within itself the means for frustrating such purpose. The problem here, as I see it, is not *whether*, but *by what approach*, such transactions should be disapproved. I think that this Court, in deciding the present case, placed too much emphasis on the formalisms and labels under which the transactions were conducted; and that it failed to give adequate consideration of the realities of what actually was done, and what objectives were intended to be attained.

There is no merit to the suggestion that courts are helpless to deal with such situations; and that, under the separation-of-powers doctrine, relief can be afforded only through action of Congress. Such a suggestion was rejected by the Second Circuit in *Helvering* v. *Gregory, supra*, wherein the court said:

It is quite true, as the Board has very well said, that as the articulation of a statute increases, the room for interpretation must contract; but the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create. * * *

Also, in *Helvering* v. *Clifford, supra*, the Supreme Court held that the mere fact that Congress, in dealing with a specific section of the statute, had chosen either to provide or not to provide for certain situations to which a "rule of thumb" might be applied, did not render the courts powerless to apply the general intent of the sec-

tion involved, in other situations for which Congress had not specifically provided. Hence the maxim of *"Inclusio unius est exclusio alterius,"* upon which the majority of this Court has so heavily relied, is not applicable.

(5) There would appear to be several avenues available for judicial approach to the present problem. One approach would be to hold that allowance of the claimed deductions under section 23(b) would violate the spirit and intent of the statute. In *Holy Trinity Church v. United States*, 143 U.S. 457, the Supreme Court said:

It is a familiar rule, that *a thing may be within the letter of the statute and yet not within the statute*, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. *This is not the substitution of the will of the judge for that of the legislator*, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the *absurd results* which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act. * * * [Emphasis supplied.]

Another approach would be to regard the present transactions as mere shams, as was done in *Eli D. Goodstein, supra,* and the other cases hereinabove cited in connection therewith. Apposite to this approach is the following statement of the Supreme Court in *Gregory v. Helvering*, 293 U.S. 465:

The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.

A third approach would be to treat petitioner's "interest" payments (which were his only outlay toward attaining his objective through the step-by-step transactions) as his "cost" of picking up the appreciation on the securities which he employed, and then offsetting such costs against his proceeds, in order to truly reflect the income or loss from the transaction as a whole. The fact that an item has been labeled "interest," even when all formalities have been meticulously observed, is not conclusive as to the item's true character. *Emanuel N. (Manny) Kolkey*, 27 T.C. 37, affd. 254 F. 2d 51 (C.A. 7).

I deem it unnecessary in this dissenting opinion, either to select or to develop the one solution which would be most appropriate. It seems sufficient to state respectfully, that of all the possible solutions, the one which in my view most clearly appears to be wrong, is that of approving the claimed deductions.

I would have approved the determinations of the Commissioner.

HARRON, *J.*, agrees with this dissent.