Kapel Goldstein and Tillie Goldstein v. Commissioner.
Goldstein v. Commissioner
Docket No. 94448.
United States Tax Court
T.C. Memo 1964-273; 1964 Tax Ct. Memo LEXIS 65; 23 T.C.M. (CCH) 1651; T.C.M. (RIA) 64273; October 20, 1964
*65 Case Withdrawn and Vacated 11/23/1964 Held, that amounts paid by petitioner as prepaid interest on funds borrowed to purchase Treasury notes are not deductible, where the Treasury note transactions would result in economic losses and where the actual motivating purpose of borrowing the funds was to reduce taxes through deductions of such prepaid interest. I. Meyer Pincus, for the petitioners. John E. McDermott, Jr. and Donald H. Cuozzo, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined a deficiency in the income taxes of the petitioners for the calendar year 1958 in the amount of $55,193.34. There is only one issue for decision: Are the petitioners entitled to an interest deduction of $81,396.61 under section *66 163(a) of the 1954 Code for the taxable year involved, representing amounts alleged to be prepaid interest which were paid to two banks in respect of alleged loans of money to petitioner Tillie Goldstein for the purchase of U.S. Treasury notes and bonds. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits therein identified, is incorporated herein by reference. Petitioners, Kapel and Tillie Goldstein, were during the taxable calendar year 1958 husband and wife, residing in Brooklyn, New York. They filed a joint Federal income tax return for said year, on the cash receipts and disbursements basis, with the district director of internal revenue at Brooklyn. The term "petitioner" as used herein, will have reference to Tillie Goldstein. During the taxable year 1958, Kapel and Tillie Goldstein were an elderly retired couple in their seventies. Neither was engaged in any trade or business. As of December 1, 1958, (prior to receipt of a substantial sum as sweepstakes winnings - presently to be described) their assets consisted of the following: Dry Dock Savings Bank
$ 1,350
First National City Bank
360
Dry Dock Savings Bank (second acct.)
700
Note receivable from Lou Katz
6,000
Loan receivable from Sidney Handsman
3,000
Funds on deposit, New York Life In-
surance Company (matured endow-
ment policy)
1,000
U.S. Government Series E Bonds
1,000
Cash surrender value of life insurance
policies (estimated)
2,500
Total assets
$15,910
*67 The record does not contain evidence of their liabilities (if any) at said date. Apparently, their only sources of income at this time were a small pension of Kapel's (amounting to about $750 per year), and interest income of approximately $125 per year. Fortune smiled broadly on Tillie Goldstein in 1958, for in that year she was found to be the holder of a winning ticket on the Irish Sweepstakes, as a result of which in December of said year she received $140,218.75, which she deposited in a bank account. Petitioner and her husband had a son, Bernard, who practiced as a certified public accountant in New York City. In connection with his practice he advised his clients from time to time on financial matters, including giving advice with respect to the investment of their funds. Bernard undertook to advise petitioner with respect to the investment of the money which she had won; and in the transactions revolving around the purchase and sale of Government securities presently to be described, he acted as petitioner's agent. In the summer of 1958, the market for bonds and notes issued by the Treasury of the United States had suffered its most severe decline in 20 years. This *68 market decline was extensively publicized in business periodicals and in the financial sections of newspapers, which Bernard read in connection with the conduct of his accounting practice. By December 1958, the Government securities market had rallied slightly; and Bernard (along with certain Government economists and persons in the securities business) was hopeful and was of the belief that the market was on the way to a recovery that would take the prices of Government securities back to the high positions they had enjoyed earlier in the year. The following table shows, as of December 24, 1958, price data with respect to Treasury 1 1/2 percent notes (hereinafter called "Treasury 1 1/2's"): Maturity date of
High for
Low for
Treasury 1 1/2's
Bid
Asked
Yield (%)
1958
1958
Apr. 1, 1959
99.22
99.26
2.24
(not shown)
(not shown)
Oct. 1, 1959
99.2
99.8
2.51
100.23
98.4
Apr. 1, 1960
98.2
98.10
2.87
100.12
97.20
Oct. 1, 1960
97.4
97.12
3.04
100.4
96.14
Apr. 1, 1961
95.28
96.4
3.29
99.14
95.16
Oct. 1, 1961
94.24
95.0
3.42
99.2
94.0
Apr. 1, 1962
93.14
93.22
3.57
98.8
92.20
Oct. 1, 1962
92.12
92.20
3.61
97.24
91.16
Apr. 1, 1963
91.14
91.22
3.61
97.12
90.8
Oct. 1, 1963
90.14
90.22
3.65
91.28
89.10
Note: In the columns of the foregoing table headed "Bid," "Asked," "High for 1958," and
"Low for 1958," the digits following the decimal point represent 32d's of a whole dollar rather
than 100ths of a whole dollar. Whenever prices of Treasury bonds and notes are mentioned
throughout the remainder of these findings, and in the opinion, the fractional part of a quoted
price will be in terms of 32d's, viz., 99.24 would mean 99-24/32 rather than 99-24/100.
*69 Beginning in November 1958 (at which time it was known that petitioner held a winning sweepstakes ticket, but prior to actual receipt of her winnings), Bernard held a series of conferences with an attorney of his acquaintance, looking to investment opportunities for petitioner's winnings and also to means of reducing the Federal income tax to be paid on those winnings. The upshot of these conferences was a plan whereby petitioner would borrow funds which would be used to purchase Treasury 1 1/2's; and whereby she would prepay the interest on the loans to their maturity, and deduct such interest on her income tax return for 1958 (in which return there would also be reported as income the $140,218.75 of her sweepstakes winnings). During 1958, petitioner paid Bernard and the attorney for their services the aggregate sum of $6,500, which she deducted on her return for said year as "legal and accounting fees." On or about January 1, 1959, shortly after the presently to be described transactions were initiated, Bernard made a computation showing the amount of the sweepstakes winnings that would be retained by petitioner after payment of Federal and state income taxes, if the projected *70 transactions were carried out and completed, and if the market for Government securities remained constant at the level it had reached at the end of 1958. This computation is as follows: Estimated Calculation of Money Retained from Irish Sweepstakes
Income
Disbursements
1958
$140,000.00
Fed. tax
$ 13,914.04
State tax
8,807.66
Charities
1,300.00
Fees (incl. $3000 BG * )
6,500.00
Tip - Katherine
1,000.00
Prepaid interest
81,396.61
$140,000.00
$112,918.31
Less disbursements
112,918.31
$ 27,081.69
1959
Interest collected
$ 15,000.00
State tax
None
Less Accrued Int. Paid
3,750.00
Federal tax
$ 1,700.00
$ 11,250.00
Less Federal tax
1,700.00
$ 9,550.00
1960
Interest 500 M 1 yr.
$ 7,500.00
State tax
None
Interest 500 M 1/2 yr.
3,750.00
Federal tax
$ 3,800.00
$ 11,250.00
Cap. Gain 1961-Bonds Estimated
S. P.-98 6/32-Cost 95 6/32
Cap. Gain = 15,000
15,000.00
$ 26,250.00
Less Federal tax
3,800.00
$ 22,450.00
1961
Interest 500 M 9 mo.
$ 5,625.00
State tax
$ 150.00
Estimated Cap Gain-S. P.-98
Federal tax
3,600.00
6/32-Cost = 92 30/32
26,250.00
$ 3,750.00
$ 31,875.00
Less Fed. & State tax
3,750.00
$ 28,125.00
*71 Summary of Money Retained
Federal Taxes
1958
$27,081.69
$13,914.04
1959
9,550.00
1,700.00
1960
22,450.00
3,800.00
1961
28,125.00
3,600.00
$87,206.69
$23,014.04
B.G. *
2,200.00
$89,406.69
Transactions with respect to Treasury 1 1/2's maturing October 1, 1962 Bernard, acting on behalf of petitioner, after approaching a bank and two brokerage houses, determined to deal with the firm of Garvin, Bantel & Co. in the purchase of these Treasury 1 1/2's. Garvin, Bantel is a member of the New York and American stock exchanges, with offices in New York City; and it is engaged in the business of buying and selling securities (including U.S. Government securities) for its clients. The firm also engages in the business of arranging collateral loans for its customers; and in this capacity, it is known as a "money broker." Garvin, Bantel purchased $500,000 face amount of Treasury 1 1/2's maturing October 1, 1962, for *72 petitioner from Malon S. Andrus, Inc. of New York City; and said Treasury notes were directed to be delivered by Andrus to the First National Bank of Jersey City (hereinafter called the "Jersey City bank") for petitioner's account. The purchase was confirmed by a confirmation slip from Andrus dated December 31, 1958, which stated that the price was 92.30, plus accrued interest of $1,875, or a total of $466,562.50, and that the Treasury notes would be delivered to the Jersey City bank. Garvin, Bantel received a commission of $156.25 from Andrus, for the former's services in connection with the purchase of the 1962 Treasury 1 1/2's. Also, on December 31, 1958, petitioner borrowed from the Jersey City bank $465,000, to be used for the purchase of the 1962 Treasury 1 1/2's. The loan was evidenced by a promissory note signed by petitioner, with recourse, due on October 15, 1961, and bearing interest at the rate of 4 percent per annum, which was the prevailing rate at the time for loans of this character. Said promissory note further recited that the maker had deposited with the Jersey City bank as collateral security "the following property owned by the undersigned [petitioner], viz: *73 500 M U.S. Treasury 1 1/2% due 10-1-62." Typed on the promissory note was the statement: "Either party has the right to accelerate the maturity of this note after 30 days." The loan was negotiated for petitioner by Garvin, Bantel, in its capacity of "money broker," acting pursuant to arrangements made with it by and on the initiative of Bernard as petitioner's agent. Garvin, Bantel received a commission from the Jersey City bank equal to 1/8 of 1 percent of the principal amount of the loan - the normal rate and practice in this type of transaction. Petitioner instructed the Jersey City bank to receive from Andrus the Treasury 1 1/2's as collateral for the loan; and on January 16, 1959, the bank stated in a letter to petitioner: [We] confirm that on December 30, 1958 500,000. U.S. Treasury 1 1/2% Notes due October 1, 1962 were purchased from Malon S. Andrus, Inc. for your account. Said securities were delivered to us against payment of $466,562.50 on December 31, 1958. Petitioner, on December 30, 1958, paid to the Jersey City bank, by means of a certified check drawn on the Irving Trust Company, the sum of $52,596.61, as interest on the above-mentioned $465,000 loan to the *74 date of its maturity, October 15, 1961. Said check was delivered on behalf of petitioner to Garvin, Bantel for delivery to the Jersey City bank, and was received and deposited by the Jersey City bank on December 30, 1958. The loan by the Jersey City bank to petitioner was made without anyone at the bank seeing or talking to petitioner or Bernard, and without an investigation of the credit rating or financial standing of petitioner or of her husband. It is not the custom of the bank to make an investigation of the credit rating of the borrower in instances where large loans for the purchase of Government securities are placed with the bank by "money brokers"; and in such instances, the bank's practice is to address all communications respecting the loans to the broker, rather than to the borrower. On April 22, 1959, the Jersey City bank wrote the following letter to Garvin, Bantel: RE: Tillie Goldstein Gentlemen: At present, the subject owes us $465,000., on a loan arranged thru your office drawn to mature October 15, 1961. After reviewing our anticipated requirements for the immediate future, it has been deemed necessary to exercise the thirty day call privilege in connection *75 with this loan to the extent of calling it for payment on June 20th next. The calling of the loan by the Jersey City bank was not the result of any prearranged plan or scheme. At the time the loan was made, there were no agreements or commitments that the loan would be called on any certain date. Garvin, Bantel advised petitioner of the Jersey City bank's decision to call the loan; and thereupon Bernard contacted Garvin, Bantel to see if the loan could be transferred to some other lending institution. An officer of Garvin, Bantel advised Bernard that he could arrange to transfer the loan to another brokerage firm in New York City, Gruntal & Co. Subsequently, on June 8, 1959, petitioner was advised by a letter from Gruntal, that it would carry petitioner's $465,000 loan "at an interest rate of 1/4% above money cost" to it. On the next day, June 9, the Jersey City bank delivered the 1962 Treasury 1 1/2's to Gruntal, against payment of the full amount of petitioner's $465,000 indebtedness to the Jersey City bank. The Jersey City bank delivered to Gruntal, together with the securities, a check for $42,944.61, for the account of petitioner, representing a rebate of the unearned portion *76 of the prepaid interest. And on the same day, the Jersey City bank sent to Garvin, Bantel, petitioner's note, duly canceled and marked "paid." Petitioner did not receive this rebated interest, rather it was credited to her account and was subjected to monthly interest charges against petitioner by Gruntal. The 1962 Treasury 1 1/2's received by Gruntal and held for petitioner's account were sold on December 1, 1959, for a price of 91.26, plus accrued interest of $1,270.49, less commission of $78.13, or a net total of $460,254.86, which was credited to petitioner's account with Gruntal. Petitioner sustained a loss on this transaction of $5,703.13. Concurrently with the sale of the Treasury 1 1/2's, petitioner purchased through Gruntal $500,000 face amount of Treasury 2 1/2% Bonds, due November 15, 1961 (hereinafter called "1961 Treasury Bonds"). This purchase was confirmed by Gruntal in a confirmation slip dated December 1, 1959, which stated that the purchase price was 95.13 plus accrued interest of $583.79, or a total of $477,693.17 which amount was charged to petitioner's account on December 1. Bernard ordered this substitution of 1961 Treasury Bonds for the 1962 Treasury 1 1/2's, *77 for the reason that the former had a higher yield than the latter, and also an earlier maturity. Thereafter, on February 4, 1960, petitioner sold $250,000 of the 1961 Treasury Bonds, at 96.17 plus accrued interest of $1,407.97, less commission of $78.13 - or a total of $242,657.97, which Gruntal credited to petitioner's account. And subsequently on June 13, 1960, petitioner sold the remaining $250,000 of 1961 Treasury Bonds at 98.26 plus accrued interest of $509.51, less commission of $156.25 - or a net total selling price of $247,384.51 which likewise was credited to petitioner's account. Petitioner realized an aggregate gain of $10,431.85 in the sales of the 1961 Treasury Bonds. Petitioner's account with Gruntal was closed out on June 25, 1960. Transactions with Respect to Treasury 1 1/2's Maturing October 1, 1961 As an integral part of Bernard's plan for investing petitioner's winnings and achieving an interest deduction for Federal income tax purposes, a second transaction was initiated at the same time that the above-described transaction respecting the 1962 Treasury 1 1/2's were begun. This second transaction involved the purchase of $500,000 face amount of Treasury 1 *78 1/2% notes, maturing October 1, 1961 (hereinafter called 1961 Treasury 1 1/2's, and not to be confused with the above-mentioned Treasury 2 1/2% Bonds, maturing November 15, 1961). Bernard dealt directly with the Royal State Bank of New York City through its president, Henry Barber, in this second transaction. Pursuant to arrangements made between Bernard and Barber, the Royal State Bank on December 31, 1958, purchased for petitioner's account $500,000 face amount of 1961 Treasury 1 1/2's from the brokerage house of C. J. Devine & Co., in New York City. These bonds were purchased at 95.6, plus accrued interest of $1,875, or a total of $477,812.50, which amount was charged by the bank to petitioners account. Also on December 31, 1958, petitioner borrowed from the Royal State Bank $480,000. This amount was credited to her account, and concurrently set up on the Royal State Bank's books as a collateralized loan. The loan was evidenced by petitioner's promissory note dated December 31, 1958, with recourse, in the amount of $480,000, "at the legal rate," and due 18 months after date, or on June 30, 1960. The rate of interest actually charged at the time this note was issued was 4 percent *79 per annum, the going rate on loans of this type at the time. Said note further recited that the maker (petitioner) had therewith "pledged, assigned and transferred to" and "deposited with" the Royal State Bank "as collateral security for the payment of any and all liabilities and obligations of the undersigned to the Bank," including "this note and any renewals, modifications or extensions thereof," the following property: "$500,000 U.S. Treasury 1 1/2% 10/1/61." Petitioner paid by means of a certified check drawn on the Irving Trust Company dated December 30, 1958, to the Royal State Bank, $28,800, as interest at 4 percent per annum on her note of $480,000 until its maturity on June 30, 1960. The check was delivered to the Royal State Bank on behalf of petitioner, and was received and deposited by said bank on December 31, 1958. Also on December 31, 1958, the Royal State Bank wrote the following letter to petitioner: This will acknowledge receipt of your certified check on the Irving Trust Co. in the amount of $28,800.00, representing payment to the Royal State Bank of New York of interest for 18 months at 4% on your collateral note of $480,000. We are also enclosing statement *80 showing the purchase of $500,000 U.S. Treasury Notes, 1 1/2%, due October 1, 1961, for which we charged your account today $477,812.50. We are also enclosing copy of credit advice of your note of $480,000. About 5 months later, on June 3, 1959, the Royal State Bank sent a letter to petitioner, which read as follows: In view of the continued depreciation in the Government Bond market, which has reduced the value of your collateral, and the rise in the interest rate, we herewith request that you either liquidate your loan at the bank or pay us an additional sum of $2,600 which represents interest of 1/2 of 1% per annum on your note of $480,000 for the period of June 1, 1959 to June 30, 1960. Please advise immediately whether you will liquidate this loan or pay the additional interest charge. Following a conference between Bernard and Barber (president of the Royal State Bank) wherein it was learned that if petitioner desired to continue the loan, she had the option of furnishing additional collateral or of paying the additional interest mentioned in the above letter, Bernard decided that petitioner should take the latter course. Petitioner thereupon on June 8, 1959, sent a *81 check to the Royal State Bank in the amount of $2,600, the additional interest required by said bank. Thereafter in September 1959 the Royal State Bank contacted the attorney who was advising petitioner and Bernard, regarding the loan and the collateral therefor. In accordance with arrangements made between the bank and the attorney, Bernard sent to the bank as additional collateral for the loan, a passbook belonging to petitioner evidencing an account she then had with a savings and loan association, having a balance at that time of $4,500, together with an instrument of assignment relating to the passbook. Pursuant to Bernard's instructions, the 1961 Treasury 1 1/2's held for petitioner's account by the Royal State Bank were sold on June 9, 1960, at 97.14 plus accrued interest of $1,434.43, or a total of $488,621.93. Petitioner realized a gain of $11,250, on this sale of 1961 Treasury 1 1/2's. The proceeds to the extent of $480,000 were used to pay petitioner's note to the bank, and the remaining $8,621.93 was credited to her account, which was in due course paid to petitioner. The bank also sent petitioner $1,200, as a rebate of unearned interest on the loan. Both the 1961 *82 and 1962 Treasury 1 1/2's and the 1961 Treasury bonds were purchased by petitioner with all future interest coupons attached thereto. After the notes and bonds were purchased by petitioner, and throughout the periods of time when the same were owned by her, the banks and the brokerage house (Jersey City bank, Royal State Bank and Gruntal & Co.) which held such securities as collateral, transmitted the interest income thereon to her; and she reported the same on her Federal income tax returns. Petitioner likewise reported on her 1959 return the loss sustained on her sale of 1962 Treasury 1 1/2's; and she also reported the gains realized on her sales of Government securities on her 1960 return. Petitioner was free to sell the Government securities involved herein, at whatever market price that might prevail at the time of sale. Petitioner had no arrangement, contractual or otherwise, under which she was either obligated or entitled to sell these securities to either of the banks or the brokerage houses with which she had been dealing, or to the Government bond dealers from whom such notes and bonds had been purchased, or to any other person. Nor was there any arrangement between petitioner *83 and the justmentioned parties, under which petitioner would be guaranteed a profit, or a loss on the said notes and bonds. At least as far as the two banks with which petitioner dealt in the instant case are concerned, in instances where they lend funds to a borrower for the purpose of permitting the borrower to purchase Government bonds, the banks require they have control of the collateral at all times while the loan is outstanding. The securities are delivered directly to the bank; and it is not unusual for the borrower not to see the securities. Such securities might never come into the physical possession of the borrower; and the same is true where stocks are purchased from a broker on a margin account. Also, where a person borrows funds for the purpose of purchasing securities, he is able to secure a lower rate of interest if he prepays the interest on his loan obligation. The following tabulation shows the projected economic results to petitioner at the time the above-described Treasury note transactions were entered into, if petitioner had carried out said transactions according to the plan developed by Bernard and the attorney with whom he had conferred, and if the Government *84 securities market remained constant at the level it had reached in December, 1958: Petitioner's outlay of funds: Interest prepaid to Jersey City bank
$52,596.61
Accrued interest on 1962 Treasury 1 1/2's
1,875.00
Interest prepaid to Royal State Bank
28,800.00
Accrued interest on 1961 Treasury 1 1/2's
1,875.00
Fees to Bernard and attorney
6,500.00
Total outlay of funds
$91,646.61
Petitioner's anticipated income Jer-
sey City bank transactions: Interest income: April 1, 1959
$ 3,750.00
Oct. 1, 1959
3,750.00
April 1, 1960
3,750.00
Oct. 1, 1960
3,750.00
April 1, 1961
3,750.00
Oct. 1, 1961
3,750.00
Oct. 15, 1961
312.50
Total
$22,812.50
Capital gain on sale: Proceeds of sale at 99.2
$495,312.50
Less cost
464,687.50
Gain
$30,625.00
Total interest and gain on Jersey City transactions
$53,437.50
Royal State Bank transactions: Interest income: April 1, 1959
$3,750.00
Oct. 1, 1959
3,750.00
April 1, 1960
3,750.00
June 30, 1960
1,875.00
Total
$13,125.00
Capital gain: Proceeds of sale at 98.2
$490,312.50
Cost
475,937.50
Gain
$14,375.00
Total interest and gain Royal State
$27,500.00
Aggregate interest and gain: Jersey City and Royal State transactions
$80,937.50
Less estimated Federal income tax on capital gains (45,000 at 25%)
11,250.00
Net proceeds to petitioner from Royal State and Jersey City transactions
$69,687.50
Net economic loss
$21,959.11
*85 The following tabulation shows the projected economic results to petitioner if the Treasury note transactions had been carried out according to plan, and if the Government securities market had reached the same high positions which it had reached in 1958, at the times when petitioner would sell said notes: Petitioner's outlay of funds (see preceding tabulation)
$91,646.61
Petitioner's anticipated income Jersey City
bank transaction: Interest income (see preceding tabulation)
$22,812.50
Capital Gain: Proceeds of sale at 100.23
$503,593.75
Less: Cost
464,687.50
Gain
38,906.25
Total interest and gain - Jersey City
$61,718.75
Royal State Bank transaction: Interest income (see preceding tabulation)
$13,125.00
Capital gain: Proceeds of sale at 100.12
$500,875.00
Less: Cost
475,937.50
Gain
$24,938.50
Total interest and gain Royal State
38,163.50
Aggregate interest and gain - Jersey City and Royal State
$99,882.25
Less: Estimated Federal income tax on capital gain (63,844.75 at
25%)
15,961.19
Net proceeds to petitioner from Jersey City and Royal State transactions
$83,921.06
Petitioner's net economic loss
$ 7,725.55
*86 In 1961, after the transactions in Treasury notes and bonds which are here involved had been completed, petitioner deposited some of her sweepstakes winnings in savings and loan associations; and she invested the remainder in high-grade securities such as the shares of the Atchison, Topeka and Santa Fe Railroad, Bethlehem Steel Corporation, and Socony Mobil Corporation. Set forth below is a summary of the receipts and expenditures actually made by petitioner in connection with her several transactions in Government securities, as described hereinabove: Transactions with Jersey City Bank
Prepaid interest
$52,596.81
Less: Unearned interest transferred to
Gruntal & Co.
42,944.61
Net interest outlay
$ 9,652.20
Interest Income: May 1959 payment
$ 3,750.00
Less: accrued interest at time of pur-
chase
1,875.00
1,875.00
Excess of interest outlay over interest income (loss)
($ 7,777.20)
Transactions with Gruntal & Co.
Total interest payments with respect to 1962 Treas-
ury 1 1/2's and 1961 Treasury Bonds
$17,382.61
Less: Net interest on bonds and notes
9,479.18
Excess of interest outlay on interest income
$ 7,903.43
Add: Loss on sale of 1962 Treasury 1 1/2's
5,625.00
$13,528.43
Less: Gains on sales of 1961 Treasury Bonds
11,328.13
Net excess of interest outlays over interest income and gains (loss)
($ 2,200.30)
Transactions with Royal State Bank
Net total interest prepayments
$30,200.00
Less: Interest income received
12,684.43
Excess of interest outlay over interest income
$17,515.57
Less: Gain on sale of 1961 Treasury 1 1/2's
11,250.00
Net excess of interest outlays over interest income and gains (loss)
($ 6,265.57)
Recapitulation: Loss on Jersey City Bank transactions
$ 7,777.20
Loss on Gruntal & Co. transaction
2,200.30
Loss on Royal State Bank transactions
6,265.37
Total loss
$16,242.87
*87 On her 1958 income tax return, petitioner claimed a deduction for interest paid in that year in the aggregate amount of $81,396.61, made up of $52,596.61 paid to the Jersey City bank and $28,800 paid to the Royal State Bank. If petitioner had carried out the transactions in Treasury notes as planned by Bernard, her sweepstakes winnings would have been burdened with an aggregate tax liability of $23,014.04 according to estimates made by Bernard at the time such transactions were initiated. Petitioner's tax liability on such winnings as determined by respondent after disallowance of the claimed deductions for prepaid interest, was $69,637.38. In his statutory notice of deficiency herein, the respondent disallowed the claimed interest deduction; and he explained his action as follows: The deduction claimed for alleged interest expense in the amount of $81,396.61 for the taxable year 1958 is disallowed for the reasons that the transactions involved were devoid of profit motive that the transactions were entered in merely to reduce your federal income taxes, that the transactions constitute a sham consisting of form without substance, and that the $81,396.61 does not constitute *88 a payment of interest on indebtedness within the purview of section 163(a) of the Internal Revenue Code of 1954. Opinion The issue here presented for decision is, whether petitioner Tillie Goldstein, a cash basis taxpayer, is entitled to a deduction for the amounts which she paid, as prepaid interest, on two promissory notes which she executed in connection with loans of funds from banks, which she used to purchase securities issued by the United States Treasury Department. Petitioner seeks warrant for the deduction in section 163(a) of the 1954 Code, which provides as follows: SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness. There can be no question that the amounts in question were actually paid, as interest, by petitioner. If these amounts are held by us to be deductible under the statute, then petitioner would be entitled to deduct the full amounts paid, notwithstanding that the notes were executed at the very end of the taxable year 1958 here involved and that the amounts paid actually represented prepayments for periods extending into succeeding *89 years. The rule is well established that prepaid interest is deductible by a cash basis taxpayer in the year in which payment is made, even though it covers a period or periods extending beyond the current year of payment. John D. Fackler, 39 B.T.A. 395, 398, acq. 1939-1 C.B. (Part I) 11, I.T. 3740, 1945 C.B. 109. The rule appears to be contra where the amount prepaid is for insurance ( Commissioner v. Boylston Marketing Association, (C.A. 1) 131 F. 2d 966, affirming a Memorandum Opinion of this Court; Martha R. Peters, 4 T.C. 1236; but see Waldheim Realty & Investment Co. v. Commissioner, (C.A. 8) 245 F. 2d 823, reversing 25 T.C. 1216), or for rent ( Main & McKinney Bldg. Co. v. Commissioner, (C.A. 5), 113 F. 2d 81, affirming a Memorandum Opinion of this Court; Galatoire Bros. v. Lines, (C.A. 5), 11 F. 2d 878; and Baton Coal Co., 19 B.T.A. 169, affd. (C.A. 3) 51 F. 2d 469, certiorari denied 284 U.S. 674). The courts, in the above cases, have held that where a cash basis taxpayer prepays rent or insurance, he must prorate deductions *90 with respect to such prepayment, over the future period or periods benefited by such prepayment. The rule thus applicable to prepaid rent and insurance seems to be based on much more persuasive logic than that with respect to prepaid interest; and if the matter of the year for a cash basis taxpayer to deduct prepaid interest were before us now for the first time, we would be disposed to require proration of deductions for prepaid interest over all the periods benefited. However, the rule allowing full deduction in the year of payment of prepaid interest having become rather firmly imbedded, we may assume for present purposes that it will continue to be adhered to. It needs to be said here and now that this case does not involve a Livingstone inspired deal (see Eli D. Goodstein, 30 T.C. 1178, affd. (C.A. 1) 267 F. 2d 127); that it does not involve a mere shuffling of papers or making of bookkeeping entries; and that - in short - it does not involve a lot of "hocuspocus." There is not a shred of doubt in our mind that Tillie Goldstein borrowed $945,000 which she used to purchase obligations of the Treasury of the United States - that she owned and used as *91 collateral security for the repayment of her borrowings, with respect to which she received and reported thousands of dollars of taxable income, and with respect to which she suffered losses and realized gains (likewise recognized on her tax returns) at the times these obligations were disposed of by her. And we repeat what we said above, that petitioner actually paid, as interest and with respect to the very borrowings which we have just mentioned, over $81,000, with no strings attached to retrieve it. Having said this much, we add that the Goodstein case and all of its numerous progeny of "Livingstone cases," have nothing to do with the case at bar; and if the Government means to place any reliance thereon in this case, such reliance is misplaced. Notwithstanding that taxpayers may engage in "uneconomical" or "commercially unreal" transactions such as selling securities at a known and calculated loss, as a means of offsetting capital gains, and that such losses are recognized by the taxing authorities - the teaching of the Supreme Court of the United States is that interest must be paid in a transaction where some economic benefit is calculated to inure to the taxpayer other than *92 reducing his taxes, if he is to be allowed the deduction granted by the statute for the interest paid. Knetsch v. United States, 364 U.S. 361. See also the dissenting opinions in L. Lee Stanton, 34 T.C. 1. We put the matter thusly in the recent case of Joseph H. Bridges, 39 T.C. 1064, 1075, affd. (C.A. 4) 325 F. 2d 180, where we applied the Knetsch case: "[Interest]" as used in the statute has a commercial connotation, that is, regardless of the purpose for which the money is borrowed, or the use to which it is put, and regardless of any tax consequences resulting therefrom, the amounts paid as interest must have commercial reality, there must be some valid commercial reason for paying interest, the borrower must in fact receive something in the transaction itself which would warrant the payment of interest. * * * We look then to see if petitioner's transactions had commercial reality, i.e., whether there was any valid commercial reason for her paying the interest here involved. Looking to the computations which we have made on the basis of the evidence in the present case, the transactions here involved were bound to result *93 in an economic loss to petitioner, irrespective of whether the Government securities market remained constant at its December 1958 level, or whether it regained the 1958 high position, at the times when petitioner was scheduled to dispose of her Treasury obligations. And as our Findings of Fact plainly show, petitioner did in fact lose $16,242.87 on her Government securities transactions, as they were actually carried out. In the ordinary business affairs of men, we do not think that they borrow money in order to make investments on which an economic loss is anticipated. Borrowing in such circumstances would be both uneconomical and commercially unreal. We think that the real motivating purpose of the transactions here involved, was to attempt to reduce petitioner's income tax liabilities on her sweepstakes winnings. [1] And, if the claimed deductions were allowable, she would have saved approximately $46,000 in taxes - more than enough to offset the economic loss resulting from the transactions themselves. But the teaching of the Supreme Court in Knetsch and of this Court in Bridges, is that where tax reduction is the only economic benefit flowing from the payment of interest on borrowed *94 funds, then income tax deductions are not to be allowed in respect of such interest. We decide the case for the respondent. Decision will be entered for the respondent. Footnotes
*. The initials "B.G." appearing in the foregoing calculation refer to petitioner's son, Bernard Goldstein. The amounts appearing opposite said initials were paid to Bernard for services in carrying out the securities transaction.↩
1. We can not help noting how petitioner's investment practices were changed, after the Government securities transactions were closed out, and the interest deductions had all been taken. At that time, petitioner's funds were put directly into such safe and conventional investments as savings and loan associations and the shares of large corporate enterprises, such as Bethlehem Steel Corporation, on which regular income for her latter years could be anticipated.↩